RECORD NUMBER: 09-1209

# United States Court of Appeals

*for the*

# Fourth Circuit

---

**UNITED RENTALS, INC.**,

*Appellant,*

– v. –

**JAMES B. ANGELL, Trustee,**

*Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

# BRIEF OF APPELLEE

JAMES B. ANGELL
PHILIP W. PAINE
HOWARD, STALLINGS,
   FROM & HUTSON, PA
5410 Trinity Road
P.O. Box 12347
Raleigh, North Carolina 27605
(919) 821-7700

*Counsel for Appellee*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 09-1209    Caption: United Rentals, Incorporated v. James Angell

Pursuant to FRAP 26.1 and Local Rule 26.1,

James B. Angell    who is    Appellee    , makes the following disclosure:
(name of party/amicus)          (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO
2.  Does party/amicus have any parent corporations?   ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
    If yes, identify entity and nature of interest:
    Please see attached.

5.  Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☑YES ☐NO
    If yes, identify any trustee and the members of any creditors' committee:
    James B. Angell is the Chapter 7 Trustee for Partition Plus of Wilmington, the Debtor. Attachment

## CERTIFICATE OF SERVICE
**************************

I certify that on this date I served this document on all parties as follows:

Richard I. Hutson, Esq..
James D. Fullerton, Esq.
Fullerton & Knowles, PC
12644 Chapel Road, Suite 206
Clifton, VA 20124
Attorneys for Appellant

James R. Vann, Esq.
Vann & Sheridan, L .L.P .
P.O . Box 2445
Raleigh, NC 27602-2445
Attorneys for Appellant
LR 83.1 Counsel

_____
(signature)

March 9, 2009
_____
(date)

Reset Form

SUPPLEMENT TO APPELLEE'S DISCLOUSRE OF CORRPROPATE AFFILIATIONS AND OTHER INTERESTS

**Disclosure No. 4**: In the interest of full and complete disclosure, James B. Angell, Chapter 7 Trustee for Partitions Plus of Wilmington, Inc. d/b/a Partitions, Inc. d/b/a Storm Protection Systems ("Debtor"), understands that publicly held corporations are creditors of the Debtor. To the extent that any such publicly held entity may entitled to receive a distribution from the bankruptcy estate of the Debtor by virtue of being a creditor of the Debtor, then those publicly-held entities are deemed to have as "indirect" financial interest in the outcome of this litigation for the purposes of this disclosure. If requested, James B. Angell, will attempt to identify and disclose publicly held corporations that are creditors of the Debtor.

**Disclosure No. 6:** There is no creditors committee.

# **TABLE OF CONTENTS**

Corporate Disclosure Statement

Table of Authorities ................................................................... v

Statement of Subject Matter and Appellate Jurisdiction ............... 1

Statement of the Issues Presented .............................................. 1

Statement of the Case ............................................................... 1

Statement of the Facts ............................................................... 2

Summary of the Argument ......................................................... 4

Standard of Review ................................................................... 6

Argument ................................................................................ 6

I.    The Bankruptcy Court properly granted summary judgment for the Trustee finding that the Transfers are Preferential Transfers pursuant to Code §547(b) .................................................. 6

    A.    Code §547(b) ................................................................ 7

    B.    The Defendant's "inchoate" lien rights under N.C.G.S. Chapter 44A do not result in rights to payment in full .............. 7

        1.    A Claimant who does not comply with Chapter 44A does not have a "charge against or interest in property" ........................................................ 9

            a.    Subrogation Lien on Property ............................. 9

            b.    Lien on Funds ....................................... 11

            c.    Valuation of lien claims ..................................... 12

i

2.   Defendant did not have s lien as a result of its "inchoate lien rights" ...................................... 13

3.   Defendant's "Inchoate Lien Rights" did not have the effect of a "charge against or interest in property to secure payment of a debt or performance of an obligation" necessary to a secured claim .............................................. 13

4.   Defendant is not entitled to the presumption that it "could have" or "would have"  filed a lien claim against funds owed to the Debtor on the contracts ........ 16

   a.   Defendant's lien rights were always "inchoate" and could not be perfected ................ 16

   b.   Defendant could not have perfected its "inchoate lien rights"  after the filing date because of the automatic stay .............................. 17

   c.   Had Defendant attempted to perfect its "inchoate lien rights" prior to the filing date, the perfection would have been avoidable by Trustee ................................................. 19

5.   Defendant's "inchoate lien rights" are simply unexercised remedies ...................................... 20

6.   Defendant is not entitled to the presumption that it "would have" filed a lien claim against the real property in the Mayfaire project ................................... 24

7.   Case law supports the Trustee's position ..................... 25

8.   Defendant's assertion that "The fact that [Defendant] did not actually file a lien … claim does not impact [Defendant's] status at the time of the Transfers or the fact that the estate was not diminished" [Brief, 33] is not in accordance with North Carolina law ....................................... 27

a.  The pro rata distribution scheme of N.C.G.S.§44A-21 may result in a "micro-preference" diminishing the bankruptcy estate upon payment of a Subcontractor in the full amount owed ........................................... 27

b.  The "micro-preference" issue ............................. 28

c.  Hypothetical chapter 7 liquidation ..................... 30

C.  The Defendant's unasserted rights against the bonding company did not result in rights to payment in full from the Debtor's bankruptcy estate ................................. 31

D.  Burden of Proof ........................................................ 35

II.  The Bankruptcy Court did not err in finding that Defendant failed to meet its burden of proof to show the "new value" defense under Code §547(c)(1) .......................................... 38

A.  Code §547(c)(1) ....................................................... 39

B.  An implicit "release" of Defendant's unasserted Chapter 44A remedies or rights to make claims on bonds is not "new value" ................................................................. 40

C.  Defendant's unasserted bond claims did not result in a contemporaneous exchange of new value ................................ 42

1.  Applying *Pennington* ...................................... 42

2.  *Pennington* is an incorrect statement of the law ............ 43

3.  Releasing bond claims is not "new value" ................... 45

4.  Mere discharge of an unsecured claim is not "new value" .......................................................... 48

D.    The funds paid to Defendant in the Transfers did not
result in "new value" as a result of Chapter 44A .................... 48

E.    Defendant failed to meet its burden of proof ........................... 53

III.    Defendant may not raise a defense under Code §546(c)(6) for
the first time on appeal ....................................................... 55

Conclusion ..................................................................................... 55

Request for Oral Argument ........................................................... 57

Certificate of Compliance

Addendum

Certificate of Service

iv

# TABLE OF AUTHORITIES

## Cases

*Angell v. Pennington, (In re Partitions Plus of Wilmington, Inc.)*,
    2008 Bankr. LEXIS 1994 (Bankr. E.D.N.C. 2008) ......... 42, 43, 44, 56

*Callaway v. Kiddco, Inc. (In re Jacobsen Construction, Inc.)*,
    Adversary Proceeding No. 06-00028-5-ATS
    (Bankr E.D.N.C. March 26, 2007) ..................................................... 53

*Committee of Creditors Holding Unsecured Claims v. Koch Oil Co.*
*(In re Powerine Oil Co.)*,
    59 F.3d 969 (9th Cir. 1995) .................................................................. 32

*Con Co, Inc. v. Wilson Acres Apartments, Ltd.*,
    56 N.C. App. 661 (1982) ...................................................................... 15

*Eason v. Dew*,
    244 N.C. 571 (1956) .............................................................................. 16

*Electric Supply Co. v. Swain Elec. Co.*,
    328 N.C. 651 (1991) .............................................................................. 24

*Embree Construction Group, Inc. v. Rafcor, Inc.*,
    330 NC 487, S.E.2d 916 (1992) .......................................................... 35

*Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd*,
    294 N.C. 661 (1978) ............................................................................... 9

*Gaston Grading & Landscaping v. Young*,
    116 N.C. App. 719 (1994) .................................................................... 24

*Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine*
*Industries)*,
    476 F.3d 238 (4th Cir. 2007) .............................................. 5, 34, 37, 41

*Holly Hill Farm Corp. v. United States*,
    447 F.3d 258 (4th Cir. Va. 2006) ....................................................... 55

*In re Builders Supply of Wilmington, Inc.*,
    40 B.R. 753 (Bankr. E.D.N.C.1984) ................................................. 23

*In re GEM Constr. Comp. Of Virginia*, ("GEM I")
    262 B.R. 638, 646 (Bankr. E.D.Va. 2000) ......................................... 50

*In re GEM Construction Corp of Virginia*, ("GEM II")
    262 B.R. 638 (Bankr. E.D. Va. 2000) ................................................ 32

*In re Golfview Development Center, Inc. v. All Tech Decorating Co.*,
    309 B.R. 758 (Bankr. N.D. Ill. 2004)................................................. 50

*In re J.A. Jones*,
    361 B.R. 94 (Bankr. W.D.N.C. 2007)........................................ passim

*In re Martin Grinding and Machine Works*,
    793 F.2d 592 (7th Cir. 1986).............................................................. 8

*In re Medlin*,
    229 B.R. Bankr. 353 (Bankr. E.D.N.C. 1998) .................................. 22

*In re Murphy Elec. Co., Inc.*,
    78 B.R. 451 (Bankr. D.S.C. 1987) ..................................................... 51

*In re Shearin Family Investments, LLC*,
    Case No. 08-07082-8-JRL (Bankr. E.D.N.C., April 17, 2009)... passim

*In re The Electron Corp.*,
    336 B.R. 809 (10th BAP 2006) ......................................................... 50

*Invex, Ltd. v. Cassirer (In re Schick)*,
    1998 U.S. Dist. LEXIS 10603 (S.D.N.Y. July 10, 1998) ................. 48

*Mace v. Construction Corp.*,
    48 N.C. App. 297 (1980)................................................................... 27

*McCoy v. Wood*,
    70 N.C. 125 (1874).......................................................................... 16

*Memphis & L.R.R. v. Dow*,
   120 U.S. 287, 7 S.Ct. 482, 30 L.Ed 595 (1887) ................................. 33

*North Carolina Nat'l Bank v. Evans*,
   296 N.C. 378 (1979) ........................................................................ 22

*O'Rourke v. Coral Construction, Inc. (In re E.R. Fegert, Inc.)*,
   88 B.R. 258 (BAP 9th Cir. 1988)
   *aff'd* 887 F.2d 955 (9th Cir. 1989) .............................................. 46, 47

*Pearlman v. Reliance Ins. Co.*,
   371 U.S. 132, 83 S.Ct. 232, 9 L.Ed. 2d 190 (1962) ........ 33, 34, 35, 45

*Precision Walls v. Crampton (In re Precision Walls)*,
   196 B.R. 299 (E.D.N.C. 1996) ............................................. 25, 26, 44

*Reliance Ins. Co. v. U.S. Bank, N.A.*,
   143 F.3d 502 (9th Cir. 1998) .............................................................. 46

*Small v. Williams*,
   313 F. 2d. 39 (4th Cir. 1963) ....................................................... 35, 36

*Smith v. Creative Fin. Mgmt., Inc. (In re Virginia-Carolina Fin. Corp.)*,
   954 F.2d 193 (4th Cir. 1992) ....................................................... passim

*Strickland v. General Bldg & Masonry Contractors, Inc.*,
   22 N.C. App. 729 (1974) .................................................................... 10

*United Bonding Ins. Co. v. Catalytic Constr. Co.*,
   533 F.2d 469 (9th Cir. 1976) .............................................................. 46

*United States v. Craft*,
   535 U.S. 274 (2002) .......................................................................... 14

*Virginia Nat'l Bank v. Woodson*,
   329 F.2d 836 (4th Cir. 1964) ................................................................ 7

*Watts v. Slough (In re Slough)*,
   Adv. Pro. L-04-00015-AP, Case No. 03-100520-8-JRL
   (March 24, 2005) ............................................................................... 23

*Western Cas. V. Brooks*,
    362 F.2d 286 (4th Cir. 1966) ................................................................. 33

*Williams v. Prof'l Transp. Inc.*,
    294 F.3d 607 (4th Cir. 2002) ................................................................. 55

**Rules, Statutes and Other Authorities**

11 U.S.C. § 101(37) ................................................................. 4, 8

11 U.S.C. § 362 ................................................................. 15, 17

11 U.S.C. § 362(a)(4) ................................................................. 17, 18

11 U.S.C. § 362(b)(3) ................................................................. 17, 18, 19

11 U.S.C. § 365 ................................................................. 30

11 U.S.C. § 506(a) ................................................................. passim

11 U.S.C. § 541 ................................................................. 26

11 U.S.C. § 541(c)(1) ................................................................. 1

11 U.S.C. § 544 ................................................................. 17, 20

11 U.S.C. § 545 ................................................................. 17, 20

11 U.S.C. § 546 ................................................................. 18

11 U.S.C. § 546(b) ................................................................. 16, 17, 18

11 U.S.C. § 546(b) (1) ................................................................. 17, 18, 20

11 U.S.C. § 546(b)(1)(A)-(B) ................................................................. 18

11 U.S.C. §547 ................................................................. 4, 20, 39, 44

11 U.S.C. § 547(a)(2) ................................................................. passim

11 U.S.C. § 547(b) ................................................................ passim

11 U.S.C. § 547(b)(5) ......................................................... passim

11 U.S.C. § 547(c) ..................................................................... 39

11 U.S.C. § 547(c)(1) .......................................................... passim

11 U.S.C. § 547(c)(3) ................................................................... 4

11 U.S.C. § 547(c)(4) ............................................................... 2, 4

11 U.S.C. § 547(c)(6) ............................................... 1, 5, 55, 56

11 U.S.C. § 547(e)(2)(A) ................................................ 17, 18, 20

11 U.S.C. § 547(g) ............................................................... passim

11 U.S.C. § 548 ............................................................................ 4

11 U.S.C. § 549 .................................................................... 17, 20

11 U.S.C. § 550(a) ....................................................................... 2

11 U.S.C. § 701 .......................................................................... 30

11 U.S.C. § 704(a) ..................................................................... 30

11 U.S.C. § 704(a)(8) ................................................................ 30

N.C.G.S. § 1-116 ....................................................................... 22

N.C.G.S. § 1-440.1 .................................................................... 21

N.C.G.S. § 1-440.21 .................................................................. 21

N.C.G.S. § 1-440.25 .................................................................. 21

N.C.G.S. § 1-440.31 .................................................................. 21

N.C.G.S. § 1-440.46 ................................................................................ 21

N.C.G.S. § 42-15 .................................................................................... 16

N.C.G.S. § 44A ............................................................................... passim

N.C.G.S. § 44A-8 .............................................................................. 10, 13

N.C.G.S. § 44A-10 ...................................................................... 10, 11, 15

N.C.G.S. § 44A-11 ...................................................................... 10, 14, 15

N.C.G.S. § 44A-12 ...................................................................... 10, 14, 15

N.C.G.S. § 44A-13 ............................................................................ 11, 14

N.C.G.S. § 44A-13(c) ....................................................................... 11, 24

N.C.G.S. § 44A-16(3) .............................................................................. 11

N.C.G.S. § 44A-18 ...................................................................... 11, 12, 14

N.C.G.S. § 44A-18(1) .................................................................. 11, 13, 15

N.C.G.S. § 44A-18(5) .............................................................................. 11

N.C.G.S. § 44A-18(6) .............................................................................. 15

N.C.G.S. § 44A-20 ...................................................................... 14, 20, 21

N.C.G.S. § 44A-20(a) .............................................................................. 12

N.C.G.S. § 44A-20(b) .............................................................................. 21

N.C.G.S. § 44A-21 ............................................................................ 27, 28

N.C.G.S. § 44A-21(a) ....................................................................... 12, 28

N.C.G.S. § 44A-21 (b) ............................................................................. 28

N.C.G.S. § 44A-22 ............................................................................... 12

N.C.G.S. § 44A-23 ........................................................................... passim

N.C.G.S. § 44A-23(a) ............................................................. 10, 14, 19

N.C.G.S. § 44A-23(b) .......................................................................... 19

N.C.G.S. § 87-1 ................................................................................... 31

S.C. Code §29-7-10 (1976) ................................................................. 51

3 Collier on Bankruptcy (15th ed. rev.) ............................................. 18

73 Am.Jur.2d Subrogation § 26 (1974) ........................................... 46

Colo. Rev. Stat. 38-22-101 (2008) ................................................... 50

H.R. Rep. No. 595, 95th Cong., 1st Sess. 177, 373 (1977) .......... 47

Restatement of Security §141 (1941) ............................................... 46

Restatement (Third) of Suretyship & Guaranty § 27 (1995) ....... 46

Senate Report No. 95-989 ................................................................. 19

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The Appellee (the "Trustee") adopts Appellant ("United Rentals" or "Defendant")'s Statement of Subject Matter and Appellate Jurisdiction.

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the Bankruptcy Court erred in granting, and the District Court erred in affirming, summary judgment for the Trustee on the Trustee's claims under Code[1] §547(b) in its order dated June 14, 2007 (herein, the "Summary Judgment Order"), finding that the transfers to Defendant are preferential transfers.

2.      Whether the Bankruptcy Court erred in granting, and the District Court erred in affirming, judgment for the Trustee in its March 31, 2008 and April 30, 2008 orders (herein, the "Final Orders") finding that the preferential transfers are not subject to the "new value" defense under Code §541(c)(1).

3.      Whether Defendant is precluded from raising a defense under Code §546(c)(6) for the first time on appeal.

## STATEMENT OF THE CASE

The Trustee corrects Defendant's Statement of the Case as follows (with corrections emphasized).

The second paragraph should read: "…. The Trustee filed a Cross Motion for Summary Judgment. ***Based on the matters of record and affidavits before it at the hearing, (Record, pp. 5-170),*** on June 14, 2007, the Court granted the

---

[1] References to Title 11 of the United States Code (the Bankruptcy Code) are referred to as "Code §__".

1

Trustee's Motion for Summary Judgment and found that the Trustee had met its burden *of proof* under Code§547*(b)*. The Court also partially granted Defendant's Motion for Summary Judgment to the extent of new value credit in the amount of $8,885.66 *pursuant to Code §547(c)(4)*."

The third paragraph should read: "The case was tried on February 28, 2008 with U.S. Bankruptcy Judge the Honorable J. Rich Leonard presiding. *The issues at trial were limited to the Defendant's defense of "contemporaneous exchange for new value under Code §547(c)(1) or under other theories regarding construction lien laws as a result of the alleged release or waiver by the Defendant of claims against the Bond in the amounts received" and whether "the Trustee is entitled to a judgment against the Defendant pursuant to Code §550(a)…. as well as appropriate interest from the date of demand for return of the same." (Appendix, 181-182, 204)* On March 31, 2008, the Court entered an Order and Judgment in favor of the Trustee …."

## STATEMENT OF THE FACTS

The Trustee amends Defendant's Statement of the Facts by adding the following:

During the 90 day preference period, from June 3, 2004 through September 1, 2004, Defendant received three payments from the Debtor totaling $75,849.40

2

(the "Transfers").  (Appendix, 92)

The following chart illustrates the payments received by the Debtor on the Dosher and Mayfaire projects, the payments made by the Debtor to the Defendant on the Mayfaire, Dosher, and other projects during the preference period, and the Debtor's bank account balances on particular dates.

| Date | Payments to Debtor | Transfer to Defendant (Dosher)$_D$ | Transfer to Defendant (Mayfaire)$_D$ | Transfer to Defendant (Other)$_D$ |
|---|---|---|---|---|
| May 10, 2004 | $45,572.85 (Dosher)$_A$ | | | |
| May 18, 2004 | $93,581.65 (Mayfaire)$_B$ | | | |
| June 3, 3004 | Debtor's Bank Balance is $100.00$_C$ | | | |
| June 7, 2004 | $7,618.79 (Dosher)$_A$ | | | |
| June 14, 2004 | | $1,935.25 | $44,131.45 | $4,098.29 |
| June 22, 2004 | Debtor's Bank Balance is $00.00$_C$ | | | |
| June 30, 2004 | | 3,851.83 | 0.00 | 3,769.42 |
| July 19, 2004 | $7,997.53 (Dosher)$_A$ | | | |
| July 20, 2004 | | 13,391.77 | 1,935.24 | 2736.17 |
| Total | $75,849.40 | 19178.85 | 46,066.69 | 10,603.86 |

$_A$    Appendix, 114
$_B$    Appendix, 120
$_C$    Appendix, 101
$_D$    Appendix, 298

The Debtor filed for chapter 11 bankruptcy protection on September 1, 2004. (Appendix 5) On November 9, 2004, the Debtor's case was converted to one under chapter 7 of the Bankruptcy Code, and James B. Angell was appointed Trustee.

(Appendix, 5)

Defendant did not and has not ever filed any claims of lien or claim of lien on funds regarding any funds withheld from the Debtor.  (Appendix 160, 216-217) Defendant has not filed any claim on any payment bond regarding any funds owed to Defendant by the Debtor. (Appendix 160, 217)

A demand letter was sent by the Trustee to Defendant on May 16, 2006 demanding the return of the Transfers.   (Appendix 6)  The Trustee subsequently commenced this action on July 21, 2006 to avoid the Transfers pursuant to Code §547, or in the alternative, pursuant to Code §548.  (Appendix 5-7).  Defendant filed an answer on August 14, 2006, denying liability, and asserting affirmative defenses under Code §547 (c)(1), (3) and (4).  (Appendix 8-15)

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court did not err in entering the Summary Judgment in favor of the Trustee finding that the Transfers were preferential under Code §547(b). Although Defendant contends that it had a secured claim as a result of its lien rights or unfiled bond claims, it did nothing to exercise its remedies to obtain subcontractor's liens pursuant to Chapter 44A of the North Carolina General Statutes ("Chapter 44A") prior to receiving the Transfers. A careful reading of Chapter 44A makes it clear that a "lien" as provided in Code §101(37), giving rise

to a "secured claim" pursuant to Code §506(a), is not effective until the Subcontractor has complied with Chapter 44A and notices have been provided. Fourth Circuit law makes it clear that a subcontractor of a bankruptcy debtor is not entitled to the equitable interest that a bonding company might be entitled to in funds owed to the debtor. *Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine Industries)*, 476 F.3d 238, 241 (4th Cir. 2007). Therefore, when Defendant received the Transfers, it did not have a secured claim and the Transfers diminished the estate pursuant to Code §547(b)(5).

The Bankruptcy Court did not err in entering the Final Order denying Defendant's defense pursuant to Code §547(c)(1). The unasserted "inchoate lien claims" and unasserted claims against the bonding company did not amount to secured claims when the Transfers were made and the unexercised rights to exercise these remedies do not comprise "new value" as defined in Code §547(a)(2). Furthermore, Defendant failed to meet its burden of proof as to the value of its asserted secured claims, the release of which is asserted as new value.

Defendant failed to raise a defense under Code §547(c)(6) prior to this appeal and may not raise it for the first time in its Brief.

## STANDARD OF REVIEW

*See* Defendant's Statement of Standard of Review.

## ARGUMENT

Defendant's argument confounds the separate appeals of the Summary Judgment Order, granting Trustee summary judgment on the elements of Code §547(b), and the Final Orders from the trial, which address the "new value" defense under Code §547(c)(1). Defendant's argument sometimes improperly contends that Trustee failed to meet its burden of proof under Code §547(b)(5) at trial [Brief, 47], although this issue was decided in the Summary Judgment Order prior to trial. (Appendix, 171-179) Defendant also improperly argues that evidence at trial should be considered in reviewing the Summary Judgment Order, although the evidence was not before the Court at the summary judgment hearing. [Brief, 14] For the purpose of clarity, the two orders are addressed separately below.

## I.    The Bankruptcy Court properly granted summary judgment for the Trustee finding that the Transfers are Preferential Transfers pursuant to Code §547(b).

Defendant contends that the Court erred in entering summary judgment in finding that the Trustee met his burden of proof under Code §547(b)(5) [Brief, 9], because it would have enforced its claim to a lien on funds, [Brief, 25], or on the real property on which the project was performed [Brief, 25] or a bond claims,

[Brief, 25], resulting in Defendant having a secured claim.

### A.    Code §547(b).

Under Code§547(b), the trustee may avoid any transfer of:

*an interest of the debtor in property* (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) *that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title*.

The Trustee has the burden of proving the avoidability of a transfer under §547(b). Code §547(g).

### B.    The Defendant's "inchoate" lien rights under N.C.G.S. Chapter 44A do not result in rights to payment in full.

Defendant argues that, despite its failure to avail itself of the remedies available under Chapter §44A, it should be considered as a secured creditor because it had lien rights under Chapter 44A that resulted in Defendant having a "secured claim" such that the Transfers did not result in a greater payment than it would have received in a hypothetical Chapter 7 liquidation case. Code §547(b)(5).

Citing *Virginia Nat'l Bank v. Woodson*, 329 F.2d 836, 840 (4th Cir. 1964), Defendant contends that the thrust of §547(b) is not what the creditor receives, but what the bankrupt's estate has lost because it is the diminution of the bankrupt's

7

estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preference transfer" [Brief, 18] and that a pre-petition payment to a secured creditor of the debtor is not preferential. [Brief, 12, citing *Smith v. Creative Fin. Mgmt., Inc. (In re Virginia-Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir. 1992)]

Whether a creditor's claim is secured is determined under Code §506(a): "An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in such property…"  The term "lien" means "a charge against or interest in property to secure payment of a debt or performance of an obligation." Code §101(37). The existence of a liens is determined by state law, *In re Martin Grinding and Machine Works,* 793 F.2d 592 (7th Cir. 1986), in this case, the lien laws of the state of North Carolina enacted in Chapter 44A.

It was an undisputed fact at summary judgment that Defendant "has not specifically enforced any mechanic's lien rights or filed any mechanic's liens against the debtor." (Appendix, 160).  A careful reading of Chapter 44A discloses that Defendant did not have a "secured claim" when the payment was made and could not have obtained a non-avoidable "lien" prior to the filing of a hypothetical chapter 7 bankruptcy case.

Although Chapter 44A does not use the term, North Carolina courts

sometimes refer to unfiled and unperfected rights to obtain statutory liens as "inchoate liens". *See, e.g., Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd*, 294 N.C. 661 (1978). Here, Defendant contends that its unasserted Chapter 44A statutory rights result in a security interest in property of the Debtor. [Brief, 11-12] Although Defendant concedes that "[c]ase law is scant in any state on the nature of the security interest before perfection and enforcement of the lien rights" [Brief, 27], Chapter 44A and applicable case law are clear that an "inchoate lien" claim is not a secured claim. In fact, "inchoate lien claims" are merely statutory remedies available to the Defendant which might have resulted in a secured claim but for the fact that Defendant failed to comply with the statutes.

## 1.    A Claimant who does not comply with Chapter 44A does not have a "charge against or interest in property".

Defendant's defense is based on two types of liens that were available to it under Chapter 44A – (1) a lien on real property that may be asserted by the contractor ("Contractor") who is dealing with the project owner ("Owner"), or by subcontractors through statutory subrogation (the "Subrogation Lien on Property") ; and (2) a lien on funds owed by the Owner to the Contractor for the project ("Lien on Funds").

### a.    Subrogation Lien on Property.

A person who improves real property pursuant to a contract with the Owner "shall, *upon complying with the provisions of this Article*, have a *right to file* a

claim of lien on real property on the real property to secure payment of all debts owing" for materials or services provided. N.C.G.S. §44A-8. The Contractor's lien on real property "is perfected … upon the filing of the claim of lien on real property …" N.C.G.S. §44A-11 "in the [clerk's] office in the county where the real property is located … not later than 120 days after the last furnishing of labor or materials at the site of the improvement by the person claiming the lien." N.C.G.S. §44A-12. These lien rights are lost if the steps required to perfect the lien are not taken in the same manner and within the time prescribed by law. *Strickland v. General Bldg & Masonry Contractors, Inc.*, 22 N.C. App. 729 (1974).

A first, second or third tier subcontractor (herein, "Subcontractor") who has furnished rental equipment in the improvement of real property, "***who gives notice of claim of lien upon funds as provided in this Article***" may enforce the Contractor's lien on real property by complying with the statutory filing and notice requirements. N.C.G.S. §44A-23. Upon filing the claim of lien pursuant to N.C.G.S.§44A-12, the Subrogation Lien on Property is perfected as of the first furnishing of labor or materials to the site. N.C.G.S. §§44A-10, 44A-23(a). Again, Defendant's argument is not that it followed these procedures, but that it had these "inchoate lien rights" with respect to the Mayfaire project. [Brief, 8]

Once a Subcontractor has filed a claim of lien, it must "enforce" the claim of lien no later than 180 days after the last furnishing of labor or materials to the real

property by filing a lawsuit. N.C.G.S. §§44A-13, 44A-23. A claim of lien on real property is discharged by failure to enforce the claim of lien within the prescribed time. N.C.G.S. §44A-16(3).

A claim of lien on real property takes effect from the time of the first furnishing of labor or materials at the site of the improvement by the person claiming the claim of lien. N.C.G.S. §44A-10. If an action is not filed in accordance with N.C.G.S. §44A-13, then a judgment entered in an action to enforce the claim of lien is entitled only to those priorities accorded by law to money judgments. N.C.G.S.§44A-13(c).

### b.    <u>Lien on Funds</u>.

N.C.G.S.§44A-18 provides that "***Upon compliance with this Article***," a first tier Subcontractor who furnished rental equipment to the project "***shall be entitled to a lien upon funds*** that are owed to the Contractor with whom the [Subcontractor] dealt and that arise out of the improvement. N.C.G.S. §44A-18(1). This lien on funds secures amounts earned by the Subcontractor as a result of having furnished rental equipment for the project under its contract, including interest at the legal rate …N.C.G.S. §44A-18(5).

Second and third tier subcontractors have similar rights to a lien on funds owed to the Subcontractor with whom they dealt, as well as subrogation rights to claim a lien on funds owed to the Contractor and upper tier Subcontractors.

N.C.G.S. §44A-18. A lien on funds "*shall be effective*" upon the obligor's receipt of the notice, and is perfected upon the giving of notice of claim of lien upon funds in writing to the obligor. N.C.G.S. §44A-18.

*Upon receipt of the notice* of claim of lien upon funds, *the obligor is under a duty* to retain any funds subject to any liens upon funds *up to the total amount of such liens upon funds as to which notices of claims of lien upon funds have been received*. N.C.G.S.§44A-20(a). Properly perfected liens on funds have priority over all other interests or claims theretofore or thereafter created in the funds by the person against whose interest the lien upon funds is asserted. N.C.G.S. §44A-22.

### c.    <u>Valuation of lien claims.</u>

If the obligor is a Contractor or Subcontractor and the funds in the hands of the obligor, if any, are less than the amount of "*valid liens upon funds that have been received by the obligor,*" "*the parties entitled to liens upon funds shall share the funds on a pro rata basis*." N.C.G.S. §44A-21(a). If the obligor is an owner and the funds in the hands of the owner are less than the sum of the amount of "*valid claims of liens upon funds that have been received by the obligor*" and "*the amount of the valid claims of liens on real property upon the owner's property filed by the subcontractors,*" the parties entitled to liens upon funds and the parties entitled to subrogation claims of liens on real property upon the owner's property shall *share the funds on a pro rata basis*. N.C.G.S.§44A-21(b).

**2.    Defendant did not have s lien as a result of its "inchoate lien rights".**

As to the lien on real property, N.C.G.S.§44A-8 clearly states that a Contractor is merely afforded "a ***right to file*** a claim of lien on real property" "***upon complying with the provisions of [Chapter 44A].***"

N.C.G.S.§44A-23 provides that a Subcontractor "who gives notice of claim of lien upon funds as provided in Chapter 44A]" "***may***" enforce the Contractor's lien on real property by complying with the statutory filing and notice requirements.

As to the claim of lien on funds, N.C.G.S.§44A-18(1) is again clear that a Subcontractor "***shall be entitled to a lien***" "***(u)pon compliance with [Chapter 44A].***"

The necessary corollary to these statutes is that a Contractor or subrogated Subcontractor, such as Defendant, who does not comply with the statutory provisions has no "right to file" a claim of lien, subrogation to the Contractor's lien rights to file a claim of lien, or rights to a lien on funds.

**3.    Defendant's "Inchoate Lien Rights" did not have the effect of a "charge against or interest in property to secure payment of a debt or performance of an obligation" necessary to a secured claim.**

The "inchoate lien" terminology used by North Carolina courts and by the

13

Defendant raises the question under the Bankruptcy Code as to the nature of the Defendant's rights where Defendant failed to exercise its statutory rights to obtain these remedies.

A common legal idiom describes property as a "bundle of sticks" -- a collection of individual rights which, in certain combinations, constitute property. State law determines which sticks are in a person's bundle, but federal law determines whether those sticks constitute property [interests]. In looking to state law, the Court must consider the substance of the state law rights, not the labels the State gives them or the conclusions it draws from them. *United States v. Craft*, 535 U.S. 274 (2002).

From the Subcontractor's standpoint, Chapter 44A is clear that the rights in property or funds only arise upon compliance with Chapter 44A, filing of a claim of lien on property, giving notice of a claim of lien on funds, and timely enforcing a lien on property by bringing suit. N.C.G.S. §§44A-8, 11, 12, 13, 44A-23(a), (b)(4). The obligor is under no obligation to the claimant and the obligor is free to use the funds received free and clear of any obligations imposed under Chapter 44A until "receipt of the notice of claim of lien upon funds" N.C.G.S. §§44A-18, 44A-20, and, as to subrogation rights, is only entitled to claim a lien on the project once it has given notice of a claim of lien upon funds. N.C.G.S. §§44A-23(a). Thus, there is no "charge against or interest in" the funds to secure payment of the

subcontractor's claims until and unless the statutory requirements are complied with.

This issue was recently addressed in *In re Shearin Family Investments, LLC*, Case No. 08-07082-8-JRL (Bankr. E.D.N.C., April 17, 2009)(Supplemental Order, unpublished). In *Shearin*, the Court held that notices of claims of lien on funds served on the debtor, who was the owner of the improved property, after the petition was filed, were stayed by §362. In its opinion, the Court held:

> [T]he linchpin is the time at which the lien was created or took effect, thereby vesting the Lien Claimants' rights in the funds. While both a lien on real property and a lien on funds fall under the umbrella of [Chapter 44A], they are decidedly different in terms of when they become effective. A claim of lien on real property is created upon filing and perfection. N.C.G.S. §§ 44A-11 & 12. Perfection relates back to the effective date, the time at which the first material or laborer arrived on the property site being improved. N.C.G.S. §§ 44A-10 & 11. ***A lien on funds, however, "[i]s perfected upon the giving of notice of claim of lien upon funds in writing to the obligor. . . and shall be effective upon the obligor's receipt of the notice." N.C.G.S. § 44A-18(6)*** (emphasis added). Further, the statute creating the lien, N.C.G.S. § 44A-18(1), is written in the future tense: "A first lien subcontractor. . . ***shall be entitled to a lien*** upon funds which are owed to the contractor. . . ." The text of the statute suggests that no lien arises until it is perfected by giving written notice and made effective by receipt. N.C.G.S. § 44A-18(6); *also see*, Con Co, Inc. v. Wilson Acres Apartments, Ltd., 56 N.C. App. 661, 665 (1982)(suggesting that a lien upon funds is effective from notification)….
>
> Simply put, an interest in property of the estate against which a lien is asserted must be present pre-petition. Here, the Bankruptcy Code steps in and freezes rights where they stood at the time the bankruptcy was initiated, ***before the Lien Claimants accrued any property interests.***

15

*Shearin*, pp. 4-5 (emphasis added). This decision affirms that "inchoate lien rights" on funds are not effective to create an "interest in property" until Defendant complied with the statutory requirements.

The weakness of Defendant's argument is best demonstrated by its reliance on *McCoy v. Wood*, 70 N.C. 125 (1874) for its position that it had a secured claim without taking any action. [Brief, 27-28] Although the theoretical underpinnings of Chapter 44A may have been the statutes in effect in 1874 when *McCoy v. Wood* was decided, *McCoy v. Wood* is no longer good law in view of the enactment of Chapter 44A. *See, Eason v. Dew*, 244 N.C. 571 (1956)(limiting the effectiveness of *McCoy v. Wood* in light of the enactment of N.C.G.S. §42-15).

      **4.**     **Defendant is not entitled to the presumption that it "could have" or "would have" filed a lien claim against funds owed to the Debtor on the contracts.**

      **a.**     **Defendant's lien rights were always "inchoate" and could not be perfected.**

Defendant admits that it did not enforce its rights under Chapter 44A [Appendix, 160], but argues that "[t]here is no need for [Defendant] to prove what it would have done absent payment claims" [Brief, 40], and that it had the right to perfect its Chapter 44A lien after the petition date without obtaining relief from the automatic stay, citing Code§546(b). [Brief, 30]. This reliance on Code§546(b) is misplaced.

Although Code §362 imposes the "automatic stay" against "any act to create, perfect, or enforce any lien against property of the estate", Code §362(a)(4), the automatic stay does not apply to "any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under [Code 546(b)] or to the extent that such act is accomplished within the period provided under [Code §547(e)(2)(A)]." Code §362(b)(3). Section 546(b) provides that "[t]he rights and powers of a trustee under Sections 544, 545, and 549 … are subject to any generally applicable law that (A) permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection; or (B) provides for the maintenance or continuation of perfection of an interest in property to be effective against an entity that acquires rights in such property before the date on which action is taken to effect such maintenance or continuation." Code §546(b) (1).

        **b.**    <u>**Defendant could not have perfected its "inchoate lien rights"  after the filing date because of the automatic stay**</u>**.**

Again, the *Shearin* case specifically found that the automatic stay prevents perfection of a lien against funds under Chapter 44A.  Distinguishing between the *perfection* of a lien created prepetition from the *creation* of a lien post-petition, the Court found that the notice of claim of lien upon funds "creates" a lien postpetition

and is not within the parameters of the Sections 362(b)(3) and 546(b)(1).

Specifically, the Court stated:

> Section 362(a)(4) stays any action to create, perfect, or enforce any lien against property of the estate. An exception to the rule is carved out by § 362(b)(3), which allows perfection of a lien to "relate-back" to the time of lien creation. Retroactive perfection thus supersedes the rights of the trustee or hypothetical bona fide purchaser to the extent that the strong arm powers are subject to perfection under § 546(b) or perfection is achieved within the grace period of § 547(e)(2)(A). …. Here, the Lien Claimants did not fit the exception. "Post-petition perfection of a lien is permitted by the [Bankruptcy] Code but post-petition creation of a lien is not." … Code §546(b)(1)(A)-(B); 3 Collier on Bankruptcy (15th ed. rev.) ¶362.03[6] ("Under this provision, a creditor may not take a security interest or create a. . . statutory lien on property of the estate." (citations omitted).

The legislative history of Section 546(b) repeatedly states that the creditor must be an "interest holder" in property or have a lien or interest in property that was "transferred" before the case was filed to be permitted to "perfect" post-petition.

> The trustee's rights and powers under certain of the avoiding powers are limited by section 546. First, ***if an interest holder*** against whom the trustee would have rights still has, under applicable nonbankruptcy law, and as of the date of the petition, ***the opportunity to perfect his lien*** against an intervening interest holder, then ***he may perfect*** his interest against the trustee. … ***The rights granted to a creditor under this subsection prevail over the trustee only if the transferee has perfected the transfer in accordance with applicable law, and that perfection relates back to a date that is before the commencement of the case.***
>
> …***The purpose of the subsection is to protect, in spite of the surprise intervention of a bankruptcy petition, those whom State***

18

> *law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection…*

Senate Report No. 95-989.

The *Shearin* decision applies to stay the Subcontractor's rights to a Subrogation Lien on Property. Under N.C.G.S.§44A-23, a Subcontractor must give notice of a claim of lien on funds to enforce the Contractor's lien. The statute clearly states that the Contractor's lien is security for the Subcontractor's lien on funds:

> (a) First tier subcontractor. -- A first tier subcontractor, ***who gives notice of claim of lien upon funds as provided in this Article***, may, to the extent of this claim, enforce the claim of lien on real property of the contractor created by Part 1 of this Article.

N.C.G.S. §44A-23(a). Similar language is used in providing subrogation rights in lower tier subcontractors. *See* N.C.G.S. §44A-23(b). Therefore, if a lien on funds is stayed pursuant to Code §362, the subrogated lien rights of subcontractors under N.C.G.S. §44A-23 are also stayed.

> **c.**    **Had Defendant attempted to perfect its "inchoate lien rights" prior to the filing date, the perfection would have been avoidable by Trustee.**

Since the Transfers were made during the preference period, any subsequent attempt to create a lien on funds on or after the time of the payments would similarly be avoidable under Code §547(b). The exception to the stay applicable under Code §362(b)(3) is to "any act to perfect, or to maintain or continue the

perfection of, an interest in property …. to the extent that such act is accomplished within the period provided under [Code §547(e)(2)(A)]." Code §547(e)(2)(A) provides that, for the purposes of [§547] ,… "a transfer is made (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time…"  Here, there was never a "transfer" of effective lien rights between the Debtor and the Defendant prior to the 90 day preference period. Therefore, §547(e)(2)(A) does not apply. Even the relation back provisions of §546(b)(1) are limited to sections 544, 545 and 549 and do not apply to a transfer under section 547; therefore, a Chapter 44A Lien on Funds created during the preference period is avoidable under §547(b).

**5.    Defendant's "inchoate lien rights" are simply unexercised remedies.**

Because Defendant failed to assert its rights under Chapter 44A prior to receiving the Transfers, any liens that it otherwise may have had were "inchoate" at the time Defendant received the Transfers. Accordingly, the duties of the obligor under N.C.G.S. §44A-20 did not come into play, and the obligor was free to pay the Debtor and the Debtor was free to use the funds for any expenditures it chose free of the restrictions of Chapter 44A.

"Inchoate lien rights" under Chapter 44A are similar to the procedural remedies of attachment, garnishment or lis pendens. Although each may result in a "charge against property or an interest in property," those who have property that

20

has not been subject to those procedures are under no obligation until the statutory notices are received, just as "inchoate lien rights" have no consequence until and unless the statutory notices are provided.

Under North Carolina law, pre-judgment attachment is a proceeding ancillary to a pending principal action, in the nature of a preliminary execution against property, and is intended to bring property of a defendant within the legal custody of the court in order that it may subsequently be applied to the satisfaction of a judgment for money which may be rendered against the defendant in the principal action. N.C.G.S. §1-440.1.

Garnishment is a remedy ancillary to attachment and is the remedy for discovering and subjecting to attachment the defendant's personal property in the possession of another, or indebtedness owed to the defendant. N.C.G.S. §1-440.21. Similar to the duties of an obligor under N.C.G.S.§44A-20, once a levy is made on a garnishee upon delivering to the garnishee a copy of the order of attachment, summons and notice of levy, N.C.G.S. §1-440.25, the garnishee who pays to the defendant any debt owed or delivers property to the defendant, after being served does not relieve himself of liability to the plaintiff. N.C.G.S. §1-440.31. *See* N.C.G.S. §44A-20(b). If judgment is entered for the plaintiff, the judgment may be satisfied out of money collected or paid to the sheriff in the attachment proceeding or out of the attached property. N.C.G.S. §1-440.46.

Finally, a notice of lis pendens may be filed in: (1) actions affecting title to real property; (2) actions to foreclose any mortgage or deed of trust or to enforce any lien on real property; or (3) actions in which any order of attachment is issued and real property is attached. N.C.G.S. §1-116. Without an attendant lien, the function of a lis pendens in North Carolina is to give constructive notice of the pending lawsuit. N.C.G.S. §1-116. The filing of notice under N.C.G.S.§1-116 is essential to give constructive notice to those who are not directly interested in the proceedings. *North Carolina Nat'l Bank v. Evans*, 296 N.C. 378, 381 (1979). Lis pendens is an optional procedure ancillary to the attachment remedy, and an order of attachment is valid even if not noted on the lis pendens docket. The advantage of the lis pendens is that it fixes the priority of the lien that arises when the order of attachment is subsequently perfected by judgment and levy. The lien with respect to real property relates back to the time when the notice of the order of attachment is docketed in the record of lis pendens in the county where the property is located. *In re Medlin*, 229 B.R. Bankr. 353, 358 (Bankr. E.D.N.C. 1998).

Like these remedies, the principal action in a lien suit is based on the indebtedness of the defendant to the plaintiff. Like attachment and garnishment, those who may be liable to the debtor are required to hold funds for the Subcontractor pending the outcome of the lawsuit; in both cases, failure to do so results in personal liability of the obligor. Upon obtaining a judgment against the

defendant, the plaintiff is entitled to payment from the attached property and its liens relate back to the date of attachment. Virtually the only differences between the remedy of attachment and Chapter 44A are the procedure for establishing the liens and the priority of the liens, once established.

Like Chapter 44A, these remedies may provide for interests in property that relate back to before the date the judgment finding liability is rendered. Once the judgment is entered those interests may be applied to satisfy the judgment. Also like Chapter 44A, failure to exercise the remedies does not result in a lien on property; failure to properly exercise the remedies may result in a general unsecured claim. Just as an attachment lien created within the preference period is avoidable, *see, In re Builders Supply of Wilmington, Inc.*, 40 B.R. 753, 755 (Bankr. E.D.N.C.1984), and the right to obtain enforceable rights in property or an order charging property under the attachment statutes is not a "lien" within the meaning of Code §506(a), *Watts v. Slough (In re Slough),* Adv. Pro. L-04-00015-AP, Case No. 03-100520-8-JRL (March 24, 2005)(holding that failure to properly comply with the statutory procedures for a prejudgment attachment results in failure of the claimant's lien rights), the rights of a subcontractor to similar remedies under Chapter 44A do not rise to the level of a secured claim under Code §506(a).

**6.    Defendant is not entitled to the presumption that it "would have" filed a lien claim against the real property in the Mayfaire project.**

Although a Subcontractor "who gives notice of claim of lien upon funds as provided in this Article" may enforce the Contractor's lien on real property by complying with the statutory filing and notice requirements, N.C.G.S.§44A-23, if a claim of lien is defective when filed, it is no lien. *Gaston Grading & Landscaping v. Young*, 116 N.C. App. 719, 721 (1994).

Similarly, if the Subcontractor fails to exercise its rights in a timely manner, or if the funds are paid out prior to notice being given, or, as to real property, the lien rights are waived by the Contractor, then there is no property against which the lien will attach. *See, e.g., Electric Supply Co. v. Swain Elec. Co.*, 328 N.C. 651 (1991)(Subcontractor has no lien on funds where there is nothing owed to the Contractor at or after the time the Subcontractor's lien claim is filed).

If the statutory periods lapse prior to giving notice, then the lien rights are discharged without ever having been effective. *See* N.C.G.S.§44A-13(c).

Each of these provisions supports the Trustee's contention that Chapter 44A rights are remedial available upon undertaking specific actions and not automatic property interests; furthermore, Defendant, having failed to avail itself of any of these procedures should not be indulged in the assumption that had it done so, its efforts would have been free of defects.

### 7.    Case law supports the Trustee's position.

*Precision Walls v. Crampton (In re Precision Walls)*, 196 B.R. 299 (E.D.N.C. 1996) holds that a preference defendant's Chapter 44A "inchoate lien claims" do not undermine the trustee's arguments under Section 547(b)(5) because Chapter 44A requires compliance with the statutory procedures and does not recognize perfection by possession.

In light of Defendant's failure to perfect its lien, Defendant must be classified as an unsecured creditor in bankruptcy. ... Defendant ... did not file any notice with the obligor, and therefore did not comply with the requirements for perfection. ***Under the statute only perfection vests a creditor with priority over others.*** *See id.* Nevertheless, Defendant argues that its receipt of payment should excuse its failure to perfect because it could have perfected the lien had it not received payment. In effect, Defendant asks this court to recognize perfection by possession (receipt of payment) in spite of the statutorily imposed requirement of notice.

"It is well established that a lien is lost if the steps to perfect it are not taken in the manner and within the time prescribed by law."... "If a lien is not perfected, it cannot be enforced." ...If Defendant had filed notice with the owner as prescribed by the statute, then its receipt of funds subsequent to perfection would not be avoidable by the trustee because Defendant would be a secured creditor under North Carolina law. Defendant failed, however, to comply with the statute.

Although the requirement of written notice may seem technical because the notice is given to the property owner rather than filed publicly as is done with liens on realty or personalty, the notice serves a similar purpose. For example, before a subcontractor extends credit to a contractor, it can inquire of a property owner as to the existence of any perfected liens. Notice also alerts the owner to financial instability on the part of its general contractor as well as to the possibility of the perfection of additional liens. Furthermore, the parties have not cited, and this court has not found, any North Carolina case law authorizing extra-statutory methods of perfection.

> Finally, this court is not in a position to second guess the North Carolina legislature with respect to its enactment of a notice requirement for perfection. Therefore, this court will require a subcontractor to comply with the state statute in order to obtain the protections provided by the Bankruptcy Code to secured creditors.

196 B.R. at 302-303 (citations omitted; emphasis added). The State of North Carolina has not amended its materialmens' lien statutes to eliminate the notice requirement or supplement it with "perfection by possession" in the twelve years since *Precision Walls* was decided, which reinforces that the decision is indicative of legislative intent.

Defendant miscites *In re J.A. Jones,* 361 B.R. 94, 106 (Bankr. W.D.N.C. 2007) for the proposition that "[Defendant's] Lien on Funds .. is a security interest in property of the estate" [Brief, 20]; *Jones* expressly refrained from deciding the issue as to the effect of liens of funds in the same footnote cited by Defendant in its Brief:

> … Because monies owed the debtor would be estate property under § 541, such liens could give the creditor secured status and present a bar to recovery under § 547(b)(5). ***However, this determination must also be made in the individual adversary proceedings. The present motions deal only with the subcontractor's inchoate "lien on dirt" owned by a third party.***

361 B.R. at 101 (footnote 6). *Jones* only addressed the liens on real estate held by the owner, which is the basis of Defendant's claims only with respect to the Mayfaire project. As to these liens, *Jones* held that the "since Defendants held no

liens against any debtor property, they are unsecured creditors not shielded by §547(b)(5) from preference attack." 361 B.R. at 101 (*citing Smith v. Creative Mgmt, Inc. (In re Virginia-Carolina Fin. Corp.)*, 954 F.2d 193, 199 (4th Cir. 1992). *Jones* is discussed further below as it relates to the Code §547(c)(1) defense.

      **8.**     **Defendant's assertion that "The fact that [Defendant] did not actually file a lien … claim does not impact [Defendant's] status at the time of the Transfers or the fact that the estate was not diminished" [Brief, 33] is not in accordance with North Carolina law**

          **a.**     **The pro rata distribution scheme of N.C.G.S.§44A-21 may result in a "micro-preference" diminishing the bankruptcy estate upon payment of a Subcontractor in the full amount owed.**

Although the lien rights are effective as to amounts owed at the time that notice is given or the claim of lien is filed, the lien priorities only attach to the funds due or the extent of the funds due when the lien is in effect. The statutes and case law nowhere provide that the lien relates back to funds previously owed and paid by the Owner to the Contractor or other Subcontractors. In fact, if the Owner no longer owes any funds to the Contractor when the statutory notice is received, then no funds are in the possession of the Owner to which such Subcontractor's lien can attach. The Subcontractor's lien rights are limited to the rights of the parties above him. *See*, *Mace v. Construction Corp.,* 48 N.C. App. 297 (1980).

Accepting Defendant's argument that a pre-petition payment to a secured creditor of the debtor is not preferential under *Smith v. Creative Fin. Mgmt., Inc.*

27

*(In re Virginia-Carolina Fin. Corp.)*, *supra* [Brief, 12], Defendant's application of this rule is misleading. *Smith* itself qualifies this statement by holding that a creditor is "secured" only to the extent of the value of his interest in property of the estate. 954 F.2d, at 198.

### b.    The "micro-preference" issue.

The use of the same property to value collateral for several lien claims or bond claims may diminish the estate in view of N.C.G.S.§44A-21(a) and (b). This statute calls for pro rata distribution among holders of "*valid* claims of liens upon funds *that have been received by the obligor*" and "the amount of the *valid* claims of liens on real property upon the owner's property *filed by the subcontractors*" where the obligor's personal liability is less than the amount of valid liens.

Aside from flying in the face of the clear statutory language of N.C.G.S. §44A-21, requiring filing or receipt of valid lien claims, the assumption that "inchoate lien rights" are entitled to claim the funds as collateral, as Defendant contends, would require a similar assumption as to all Subcontractors who received payments during the preference period in order to avoid a diminution of the estate, resulting in a greater number of claims.

The violence to the plain language of N.C.G.S. §44A-21 becomes clearer when one supposes that a lien creditor who has been paid in full after properly and timely asserting its Chapter 44A claims might become subject to preference

liability as a result of "inchoate lien claimants" who were paid without taking any action.

The basis of the potential for these "micro-preferences" arises where each choate or inchoate claimant is identifying the same property as its collateral to support the valuation of its "secured" claim; unless the pro rata provisions are taken into effect, the "collateral" value is "double-counted", cumulatively resulting in a diminution of the estate.

For example, assume $100,000 was due on the contract at the beginning of the preference period and $100,000 earned during the preference period. The total "collateral" for statutory lien claims could not exceed $200,000 without diminishing the estate under Defendant's theory. If a timely and properly and unavoidably perfected lien creditor received $50,000 during the preference period, no other liens having been filed, and $450,000 was paid to "inchoate lien claimants" (each of whose claim was less than $150,000) during the preference period, then no one would be liable for a preference, although the cumulative effect is that the estate as diminished by the amount of $300,000. Accepting Defendant's "inchoate lien rights" argument would also require, to avoid diminution of the estate, avoidance of the $50,000 paid to the properly perfected creditor, to allow for interests in the "collateral" to "inchoate lien creditors". This strained theorizing is in derogation of the plain language of N.C.G.S.§44A-21 and in derogation of the

rights of those who exercised their remedies for the benefit of those who failed to do so.

This issue also emphasizes the importance of the notice required in perfecting the lien as it relates to timing. Since an obligor's duties are fixed upon the receipt of the notice, the amount of funds owed to the Contractor or upstream Subcontractor can only be determined by a concrete event establishing the duty, such as receipt of the notice. Hypothesizing perfected liens and the value of hypothetically effective lien rights does nothing to provide specific guidance as to when the value of the "collateral" should be decided.

### c.   <u>**Hypothetical chapter 7 liquidation**</u>.

Although the Debtor in this case filed a chapter 11 case which was subsequently converted to a chapter 7 case, Code §547(b)(5) requires the determination of distributions in a hypothetical chapter 7 case. Upon the filing of a chapter 7 case, a chapter 7 trustee is appointed. Code §701. A chapter 7 trustee's duty is to collect and reduce to money the property of the estate, and close the estate as expeditiously as is compatible with the best interests of parties in interest, Code §704(a), and a chapter 7 trustee must obtain specific authorization to operate a business, *see* Code §704(a)(8).  An executory contract may be assumed only with authorization from the court. Code §365. Licensing considerations may preclude the trustee from completing the contract and collecting payment for the work. *See*

30

N.C.G.S. §87-1 (defining "general contractor"). Therefore, projections or actual experience as to operations conducted after the filing date should not be considered by the Court under Code §547(b)(5), as urged by Defendant. [Brief, 7]

Because Defendant did not exercise its rights under Chapter 44A, it did not have a secured claim in the funds received during the preference period. Chapter 44A does not provide a present lien, but only the rights to procedural remedies similar to attachment, garnishment and lis pendens. Had Defendant not been paid during the preference period, it would have received less than 100% of the payments received in liquidation as an unsecured creditor. Any efforts to fix its lien rights during the preference period would have been stayed under §362 or avoidable under §547(b).   Therefore, based on the evidence provided by the Trustee at summary judgment, the Defendant, as an unsecured creditor, received more than it would have received in a hypothetical chapter 7 liquidation.

### C. **The Defendant's unasserted rights against the bonding company did not result in rights to payment in full from the Debtor's bankruptcy estate.**

At summary judgment, the Bankruptcy Court determined as a matter of law, that there were insufficient funds to pay unsecured creditors in the case in full. (Appendix, 171-179) This finding is not disputed by the Defendant.

The Summary Judgment Order held that "the focus of [§547(b)(5)] is not whether the defendant would have received payment from someone else for its

31

claims. Instead, the court must determine whether in a chapter 7 bankruptcy liquidation, there would have been enough funds to pay this creditor's claim out of the estate if it had not been preferentially paid." (Appendix, 177-178)

The focus of the preference statutes is on the effect of a transfer on the debtor, not on the transferee. *In re GEM Construction Corp of Virginia*, 262 B.R. 638 (Bankr. E.D. Va. 2000)("GEM II"). As such, numerous courts, including our own Circuit, view parties holding liens on third party property (but not that of the debtor) to be unsecured creditors for §547(b)(5) purposes. *Smith v. Creative Financial Mgmt., Inc (In re Virginia-Carolina Fin. Corp.), supra*; *see also, Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 972 (9th Cir. 1995).

As the *Smith* Court explains:

> [T]he court must focus, not on whether a creditor may have recovered all of the monies owed by the debtor from any source whatsoever, but instead upon whether the creditor would have received less than a 100% payout in Chapter 7 liquidation. . . . This interpretation reflects the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate.

954 F.2d at 199. Since Defendant held no liens against any debtor property, under *Smith* it is an unsecured creditor not shielded by § 547(b)(5) from preference attack. *In re J.A. Jones*, *supra*. The Summary Judgment Order is soundly based on

precedent from this Court – although under Defendant's theories, it might have been paid by the surety as a result of the bonds, the elements of Code §547(b)(5) are not established unless the Defendant can show it had a security interest in property of the debtor, which by its admissions in response to Trustee's discovery, it cannot show. (Appendix, 160)

Defendant contends that the Transfers resulted in it being in no better position than it would have been had it not been paid because the bonding company would have paid the claim and was subrogated to the rights of the estate under the Mayfaire and Dosher contracts and sufficient funds existed to repay the bonding company. [Brief, 14-17]

The sole evidence presented by the Defendant at summary judgment that the Defendant would have filed a bond claim was a conclusory assertion that, "Had Defendant not received the alleged transfers, it would have enforced its rights pursuant to the Bond Projects on the Bonded jobs." (Appendix, 146) Defendant nonetheless admits that it did "nothing to file a claim under any bonds you may have had a right to file a claim under". (Appendix, 160)

The cases relied on by Defendant are *Western Cas. V. Brooks*, 362 F.2d 286, 490 (4th Cir. 1966), *Memphis & L.R.R. v. Dow*, 120 U.S. 287, 7 S.Ct. 482, 30 L.Ed 595 (1887), and *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed. 2d 190 (1962), addressing the issue of the subrogation rights of the surety to the

funds due to the defaulting contractor. [Brief 14-15]

The holding in *Pearlman*, decided before the enactment of the 1978 Bankruptcy Code, was that

> the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

371 U.S., at 141. The *Pearlman* court held that the bonding company in that case had an equitable right of subrogation to the rights of the debtor in these payments, and that such rights never became property of the bankruptcy estate. 371 U.S., at 135-136.

*Pearlman* involved reimbursement of the surety, not payment of claims by the principal that are subject to a surety bond.  Particularly in this case, where the Debtor deposited funds from the contractors into its bank account and then paid Defendant from the bank account, it is clear that the funds paid to Defendant were property of the estate and the reimbursement rights of the surety never came into play.

Furthermore, unexercised rights to make claims against the bonding company do not amount to a security interest. *See, Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine Industries)*, 476 F.3d 238, 241 (4th Cir. 2007)

34

(holding that *Pearlman* does not result in a subcontractor, as a supplier of goods and services to a general contractor, having equitable rights on the unpaid contract balance owed to the general contractor). There is no North Carolina case that establishes an equitable lien in favor of a subcontractor similarly situated to the Defendant; in fact, the Defendant's remedies under the statutory lien procedures, an adequate remedy at law, obviate any ability to claim an equitable lien. *See, Embree Construction Group, Inc. v. Rafcor, Inc.*, 330 NC 487, 411, S.E.2d 916 (1992).

Therefore, there is no error in the Summary Judgment Order holding that Defendant's unasserted bond claims rights resulted in a secured claim to be taken into account under Code §547(b)(5).

### D.   <u>Burden of Proof.</u>

In its Brief, Defendant argues strenuously that Trustee failed to meet its burden of proof under §547(b)(5) because Defendant had "inchoate" lien rights under these statutes to the funds owed to the Debtor, resulting in a secured claim and unasserted bond claims, invoking rights of subrogation, that resulted in the Transfers causing no diminution of the Debtor's estate. [Brief, 34, *citing Small v. Williams*, 313 F. 2d. 39 (4th Cir. 1963)("payments upon a preferred claim which have the effect of releasing assets of comparable value to the claims of general creditors are not preferential")] Defendant contends that it is relieved of the

obligation to enforce its lien rights or to file a bond claim. [Brief, 40]

The Trustee's burden of proof under Code §547(b)(5) was met upon a showing that the creditor would have received less than a 100% payout in a Chapter 7 liquidation. *In re Virginia-Carolina Financial Corp.*, *supra, see, also, Small v. Williams*, *supra* (finding that when the value of the security is substantially less than the secured claim, however, a partial payment upon the secured claim which does not effect a release of any of the security or reduce the claim to the extent that it is effectively secured, does result in a depletion of the debtor's estate.). The Bankruptcy Court properly found that "there are inadequate funds to provide a payout in full to unsecured creditors, and this fact is not contested by the defendant." (Appendix, 178)  This finding is not contested by Defendant in this appeal.

Defendant failed to show that it had a secured claim against property of the estate. It did not provide any evidence of having any liens against property of the estate under Chapter 44A, only unexercised rights to claim liens. In fact, the Defendant took absolutely no steps to enforce any lien rights that it may have had. (Appendix 145, 160), and any action to subsequently fix its lien rights would have been subject to the automatic stay, *In re Shearin Family Investments*, *supra*, or subject to avoidance under Code§547.

36

Furthermore, its unexercised rights to make claims against the bonding company do not amount to a security interest. *See, Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine Industries)*, 476 F.3d 238, 241 (4th Cir. 2007).

Therefore, in addition to determining whether Defendant would have had a secured claim when the bankruptcy was filed, Defendant will not be entitled to avoid a finding under §547(b)(5) unless it is shown that the value of the property upon which Defendant claims a security interest was equal to its claims on the filing date and the amount of the preferential payments. The Bankruptcy Court and District Court were correct in finding against Defendant on its arguments.

Defendant presents a burden of proof argument in an attempt to shift the burden to the Trustee, [Brief, 17-25], playing the Trustee's burden to prove the elements under Code §547(b) against the Defendant's burden to show new value under Code §547(c)(1). Defendant's arguments seek to avoid affirmation of the Summary Judgment Order by shifting the burden of proof as to the claims of other potential lien or bond claimants on the projects in valuing Defendant's alleged "secured claims" in view of the pro rata treatment of lien claimants or bond claimants and the "micro-preference" issues resulting from Defendant's theories as described above. This argument is disingenuous in the Defendant never filed a lien claim or made a bond claim and is not entitled to treatment as a secured creditor

under §547(b)(5).

Should Defendant assert a secured claim, a novel theory under these facts, where no notices were sent that would establish the timing of attachment of the claim, the resulting security of the claim (funds due when the secured claim attached), or the rights of similarly situated creditors, needed to value the claim, the burden of establishing the allowed amount and nature of the claim should reside with the Defendant. *See,* Fed. R. Bankr. P. 3001(d)(requiring that evidence of perfection of a security interest be attached to a proof of claim) and 3001(f)(providing presumptive validity of claim executed and filed in accordance with these rules).

## II.  __The Bankruptcy Court did not err in finding that Defendant failed to meet its burden of proof to show the "new value" defense under Code §547(c)(1).__

The Summary Judgment Order having established the §547(b) prima facie case, the issues at trial were confined to "Whether the Transfers to the Defendant are excepted from avoidance under the defense of contemporaneous exchange for new value under Code §547(c)(1) or under other theories regarding construction lien laws as a result of the alleged release or waiver by the Defendant of claims against the Bond in the amounts received" and other issues not germane to this appeal. (Appendix, 181)

### A.    Code §547(c)(1).

Code §547(c)(1) provides: "The trustee may not avoid under this section a transfer (1) to the extent such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."  "New value" means "money or money's worth in goods, services, or new credit, or *release by a transferee of property previously transferred to such transferee* in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but *does not include an obligation substituted for an existing obligation*." Code §547(a)(2).

The Summary Judgment Order allowed $8,885.66 in credit (leased equipment) provided after the payments were made as "new value" [Appendix, 178-179]; the Trustee does not appeal this finding. The "new value" addressed at trial, and the subject of this appeal, relates to inchoate lien claims and unasserted bond claims asserted by Defendant.

For the purposes of Code §547, the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under §547(c). Code §547(g).  Although Defendant sometimes argues that the Trustee failed to meet its burden of proof as to issues at trial [Brief, 51-52],

these arguments are without merit in view of the Pretrial Order and Code §547(g).

In addressing Defendant's contentions, the Trustee addresses the concept of "new value" as it relates to both Defendant's unasserted Chapter 44A remedies and Defendant's unasserted bond claims.

### B.    An implicit "release" of Defendant's unasserted Chapter 44A remedies or rights to make claims on bonds is not "new value".

Code §547(a)(2) is clear – "new value" requires "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee …."  In order for this definition to apply under the current facts, the Defendant must show that the payment was (A) intended by the debtor and the [Defendant] to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange.

There was no evidence of any written releases at the trial from which the intent of the debtor might be inferred to the effect that it intended to receive a release from inchoate lien claims or bond claims.

In addition, payment in and of itself must have resulted in an exchange or transfer of either "goods, services, or new credit" which were addressed in the Summary Judgment Order, or a "release by a transferee of property previously transferred to such transferee." The purported "release" of unexercised lien rights or unasserted bond claims is not a "release by a transferee of property previously transferred to such transferee" as required under §547(c)(1). The Debtor never

40

transferred inchoate lien rights or rights to make claims under bonds to Defendant. These "rights" were never property owned by the Debtor – they are rights that arise by operation of Chapter 44A or pursuant to obligations of the bonding company under the applicable bond. Although assertion of the Chapter 44A remedies prior to the Transfers might have arguably resulted in a transfer of a property interest in the funds from the Debtor to Defendant, in view of the failure to exercise its Chapter 44A remedies, those rights were never transferred to Defendant and so they were never released to the Debtor. As *Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine Industries)*, *supra*, makes clear, the equitable rights upon which Defendant's "indirect transfer" theory relies could not have been "a release by the [Defendant] of property previously transferred to [Defendant]" since the equitable rights were never property of the Defendant.

Furthermore, "new value" by definition "does not include an obligation substituted for an existing obligation." Defendant's argument as to its unasserted bond claims is based on its argument that the "release" of its bond claims resulted in a release of the bonding company's equitable rights against funds owed to the Debtor. As noted in *Jones, supra,* the basis of the "indirect transfer" theory is that, once the owner pays the subcontractor, the owner succeeds to the claim and exercises rights of set-off, *i.e.*, the owner's indemnification rights are substituted for the subcontractor's claim. *Jones,* at 102. The same analysis would apparently

apply to indemnification rights upon payment of a Lien on Funds or a bond claim. Based on Code §547(a)(2), these transactions cannot constitute "new value."

### C. Defendant's unasserted bond claims did not result in a contemporaneous exchange of new value.

In addressing the issue of whether the extinguishment of rights to make bond claims constitutes new value pursuant to Code §547(c)(1), the Bankruptcy Court cited *Angell v. Pennington, (In re Partitions Plus of Wilmington, Inc.)*, 2008 Bankr. LEXIS 1994 (Bankr. E.D.N.C. 2008). Under this case, in order to prevail under the new value defense premised upon a hypothetical release of rights to file a bond claim, the defendant must show that (A) had it not received payment from the debtor, it would have immediately filed a claim against the bond on the project; and (B) that at that time the debtor was still owed funds by the general contractor on which the bonding company could have asserted a lien. *Id*.

### 1. Applying *Pennington*.

Although the Trustee disputes the *Pennington* standard, the Defendant failed to meet its burden of proof under *Pennington*. The Defendant presented absolutely no evidence that it would have immediately filed any claim against a payment bond in place on either the Dosher or Mayfaire projects. (Appendix, 454- 455)

Mr. Wood, Defendant's Wilmington branch manager, testified that Defendant had not filed bond claims and could not provide testimony as to any lien claims filed by Defendant on any projects, although monies were owed when the

Debtor filed bankruptcy. (Appendix, 216-217)  No evidence was presented as to Defendant's policies or experience in asserting bond claims, actions taken to obtain copies of the bond, instructions given to attorneys or employees to compile information or prepare bond claims or any other actions whatsoever.  (Appendix, 208-217)  Defendant did not even assert at trial that, had the Transfers not been made, Defendant would have immediately filed or made lien and bond claims. Therefore, under the *Pennington* standard, Defendant's assignments of error as to Code §547(c)(1) must fail.

### 2.    *Pennington* **is an incorrect statement of the law.**

*Pennington* is an incorrect statement of the law because it does not address Code §§547(a)(2) and 547(c)(1) in light of the rights attendant to the law pertaining to bond claims. Furthermore, the "micro-preference" issue arises in the case of bonds similarly to lien claims to the extent that, under an "indirect transfer" theory, similarly situated creditors paid or unpaid during the preference period may have unasserted bond claims in the contract sum similar to those of Defendant that exceed the contract balance to which the bonding company is subrogated.

Both tests under *Pennington* beg an essential question – when would the defendant have asserted the bond claim? This issue is critical to time limitations in the bond for assertion of claims, and to determining the contract balance to which the claim attaches since the surety's subrogation rights are limited to the contract

balance after the assertion of the claim is made. As demonstrated by the fluctuations in the Debtor's bank account (Appendix, 95-107), collections and payments to other subcontractors or other creditors may affect this analysis. *Pennington* gives no guidance as to how this calculation is made.

The *Pennington* analysis furthermore fails to address whether the claim would have been made properly. Granting the Defendant the assumption that it would have made a timely and proper bond claim improperly relieves the Defendant of an element of its burden of proof by substituting a hypothetical timely and proper enforcement of its rights in contradiction of the facts at the time of the payment, *i.e.*, that no lien claims or bond claims had been made. Although Code §547(b)(5) calls for a hypothetical analysis, Code §547(c)(1) does not.

These issues support upholding the decision in *Precision Walls, Inc. v. Crampton, supra*, in requiring the filing of a claim of lien, or, by implication, a claim on a bond, to avoid the uncertainty of proof in these cases.

On the other extreme, *In re J.A. Jones*, *supra*, acknowledges this uncertainty and grants the defendant conclusive assumptions to avoid it:

> Section 547 requires us to hypothesize what the subcontractor would have received in bankruptcy had the allegedly preferential payment not been made. We cannot fairly assess how the subcontractor would have fared without projecting how it would have reacted to nonpayment. Since an individual subcontractor's reaction is unknowable, an objective approach should be employed, asking "what would a reasonable materialman have done in response to that nonpayment." It takes little commercial construction expertise to

answer. A reasonable subcontractor would assert his legal rights, liening the project, perfecting those liens and forcing payment through the owner.

We should also assume a reasonable behavior by the project owner. Again, this requires almost no imagination. With liens on this project, the owner would have no reasonable alternative but to pay the subcontractor and then seek indemnification from the general contractor.

To make any other assumption would defy reality.

*Jones*, at 103. As the Final Order points out, the problem with presuming that Defendant would have exercised its Chapter 44A remedies as new value to the preferential transfer is that it effectively relieves the defendant of its burden under Code §547(g) of establishing the actual value of the transfer. (Appendix, 462) Furthermore, the assumption made by *Jones* would defy reality in this case because Defendant testified that it had not filed any bond claims on any of the projects although it was owed money. The Defendant should not be substitute a "reasonable man" standard for proof when the evidence at trial was that it had not acted in accordance with what a "reasonable man" would have done.

### 3.    Releasing bond claims is not "new value".

In *Pearlman v. Reliance Insurance Company*, 371 U.S. 132 (1962), the Supreme Court held that, if a surety pursuant to the Miller Act pays subcontractors and materialmen, that surety has a subrogated right to contract balances. 371 U.S., at 141. The surety's right is superior to the rights of the contractor or an assignee.

45

*United Bonding Ins. Co. v. Catalytic Constr. Co.*, 533 F.2d 469, 475 (9th Cir. 1976).

The requirement that the contractor be in default for subrogation rights to apply is discussed in *Reliance Ins. Co. v. U.S. Bank, N.A.*, 143 F.3d 502 (9th Cir. 1998), dealing with the relative priorities of a bank exercising set-off rights against project funds and the surety's equitable right to the funds. As of the time the bank received the money, and as of the time the bank setoff the progress payment against its loan to the contractor, the surety had not yet paid any subcontractors. Subrogation would mean that, having paid them, the surety would step into their shoes and take over their rights to recover the money they had been entitled to. But, because the surety had not yet paid them, the unpaid subcontractors still owned the rights to payment. At common law, a surety does not become subrogated to its principal's right to payment from a third party until the surety performs the principal's obligation. Restatement (Third) of Suretyship & Guaranty § 27 (1995); Restatement of Security §141 (1941); 73 Am.Jur.2d Subrogation § 26 (1974). Thus the surety in this case had not been subrogated to the contractor's right to the government progress payment. 143 F.3d, at 506-507.

Defendant relies on *O'Rourke v. Coral Construction, Inc. (In re E.R. Fegert, Inc.)*, 88 B.R. 258 (BAP 9th Cir. 1988) *aff'd* 887 F.2d 955 (9th Cir. 1989) for its argument that release of claims against a surety is an exchange of new value under

Code §547(c)(1) [Brief, 47-48], but omits a crucial fact in the *Fegert* case – the defendant in that case actually enforced its bond claim by filing a lawsuit against the contractor and the surety prior to receiving payment, triggering the equitable lien right. No such lawsuit was filed by Defendant against the Debtor.

The Defendant admits that it did not make any bond claims. The rights of the surety to an equitable lien on the funds due to the Debtor were not triggered prior to the time that the Transfers were received by Defendant. Therefore, the equitable rights of the surety based on reimbursement did not attach when Defendant received the Transfers, and there was no "indirect transfer" of those rights to the Debtor as a result of the payment.

The language of Code §547(c)(1) requires that any transfers of property be direct transfers of "*property previously transferred to such transferee*" to constitute "new value"; the legislative history of §547(c)(1) also demonstrates that this defense is intended to be limited.

> "The [contemporaneous exchange] exception is a simple one, excepting a transfer that is really not on account of an antecedent debt . . . . No doubt a purchase by the debtor of goods or services with a check, if deemed to be on credit by state law, would be insulated by this exception. Though strictly speaking the transaction may be a credit transaction because the seller does not receive payment until the check is cleared through the debtor's bank, it is generally considered and intended to be a contemporaneous transaction, and assuming the check is promptly deposited and cleared, is in fact substantially contemporaneous."

Footnote 7, H.R. Rep. No. 595, 95th Cong., 1st Sess. 177, 373 (1977). Defendant

does not appeal the Court's findings that the Transfers were for antecedent debt. (Appendix, 173) Congress did not intend transfers of the sort argued by Defendant to be "new value" under Code §547(c)(1).

### 4. Mere discharge of an unsecured claim is not "new value".

Courts have consistently rejected preference defendants' contentions that the release of their unsecured claims to the extent of payments received constituted new value under 11 U.S.C. § 547(a)(2). All preferential payments discharge liability since antecedent debt is a necessary element in defining such transfers. *Invex, Ltd. v. Cassirer (In re Schick)*, 1998 U.S. Dist. LEXIS 10603 (S.D.N.Y. July 10, 1998).

### D. The funds paid to Defendant in the Transfers did not result in "new value" as a result of Chapter 44A.

The conditions to obtaining an effective Lien on Funds or Subrogation Lien on Property are set out above in the discussion of Code §547(b)(5). Based on these conditions and the unbridled rights of the Owner, Contractor and Debtor to use the contract funds as they see fit prior to receipt of the requisite notices or filings, free of any "charge against or interest in [the funds] to secure payment of" its claims, Code §§ 101(37) and 506(a), it is clear that Defendant was an unsecured creditor and its unexercised remedies under Chapter 44A did not constitute new value. That Defendant may have had a right to priority in payment over other claims as a result of exercising its lien rights at a later time does not establish any rights in contract

48

funds paid prior to the exercise of those lien rights

*In re J.A. Jones*, *supra*, holds that while the "inchoate lien rights" under Chapter 44A do not result in a secured claim, an express written release of those rights may give rise to a "new value" defense under Code §547(c)(1). The *Jones* decision is more limited than it appears from Defendant's arguments and is not precedential in that it nowhere addresses the peculiarities of Chapter 44A.

*Jones* was decided based on a stipulation of facts relating to numerous individual adversary proceedings. The debtor was a general contractor and the defendants were subcontractors providing work on particular projects. In footnote 6, the Court delimited the scope of its decision to liens on real estate, and it does not address the effect of an inchoate lien on funds. *Jones*, at 101 (footnote 6). *Jones* is therefore wholly inapplicable to the Dosher project, in which liens on real estate were not available. [Brief, 8]

In addition, the *Jones* court assumed the existence and validity of the asserted inchoate lien rights under state law. *Jones*, at 101.

The *Jones* Court seemingly adopted the "indirect transfer" theory to hold that an express written release of inchoate lien rights as against the owner of real estate has the effect of an "indirect transfer" of new value to the Debtor.

> This "indirect transfer" theory holds that the release of the subcontractor's lien against the owner causes a coincident release of the owner's claims against debtor, thereby creating new value to the

debtor. *In re GEM Constr. Comp. Of Virginia*, 262 B.R. 638, 646 (Bankr. E.D.Va. 2000). ("GEM I")

The "indirect transfer" theory assumes that had the debtor general contractor not paid its subcontractor, the subcontractor would have "liened" the project. The owner would be forced to pay the subcontractor, and having done so, would seek indemnification, by a setoff against other sums owed to the debtor. Section 553 preserves setoff rights in bankruptcy and the Code treats setoffs as secured claims. *See* Code §506(a). Given this, the indirect transfer theory posits that the bankruptcy estate is not harmed by the pre-petition payments to the subcontractors. *Id.*

*Jones,* at 102.

The application of the *Jones* decision to this case is suspect for several reasons. First, *Jones* fails to analyze the specific North Carolina lien laws involved. Instead, it generalizes the lien laws of various states and addresses them only in a general fashion. *Jones*, at 100 ("Typically, these lien rights arise in inchoate form from the first provision of goods and services…").

In fact, lien laws vary tremendously from state to state.  *In re The Electron Corp.*, 336 B.R. 809 (10th BAP 2006), cited in *Jones,* at 100, relies on Colo. Rev. Stat. 38-22-101 (2008), which provides that the contract between the owner and the contractor "shall operate as a lien in favor of all persons performing labor or services or furnishing laborers or materials under contract, express or implied, with said contractor.." *In re Golfview Development Center, Inc. v. All Tech Decorating Co.*, 309 B.R. 758 (Bankr. N.D. Ill. 2004), cited in *Jones*, at 100, relies on Illinois'

Mechanics Lien Act, 770 ILCS 60/1 et seq. (West 2004), which states that "(a)ny person who shall by any contract … with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve … land…has a lien upon … such … land and improvements thereon for the amount due to him or her for the material, …, services or labor, and interest at the rate of 10% per annum from the date the same is due. This lien extends to an estate in fee, … or any other estate ... that the owner may have in the … land at the time of making such contract or may subsequently acquire and this lien attaches as of the date of the contract." *In re Murphy Elec. Co., Inc.*, 78 B.R. 451, 53 (Bankr. D.S.C. 1987), cited by Defendant [Brief, 12], suffers from the same distinction, in that it relies on S.C. Code §29-7-10 (1976), which states

> Any contractor … shall pay all laborers, subcontractors and materialmen for their lawful services and material furnished out of the money received … and such laborers, as well as all subcontractors and persons who shall furnish material for any such building, shall have a first lien on the money received by such contractor … in proportion to the amount of their respective claims.

These state laws, which are the legal foundation of the asserted lien rights, vary dramatically from Chapter 44A, as described and this Court must look to the property interests created under North Carolina state law for its decision, and not adopt wholesale the rule in a majority of jurisdictions.

Second, the *Jones* Court's assumption that the subcontractor would have

acted reasonably in protecting its rights improperly assumes that no subcontractor would be neglectful of his or her rights, and that its exercise of those rights would have been timely done and in proper form. Defendant in this case did not act as *Jones* hypothesizes a "reasonable materialman" would have acted. To the contrary, Defendant argues vehemently that exercise of lien rights or rights to assert bond claims would "disrupt projects and business relations." [Brief, 51] As such, *Jones* improperly relieves the Defendant of an essential element of its burden of proof under Code §547(c)(1), that it would have exercised the very rights that it did not exercise.    *Jones* is also distinguishable in that the stipulations included express written releases of lien claims, whereas this case only addresses implicit "releases" of Chapter 44A rights based on payment. Express written releases signed by the debtor are evidentiary of the mutual intent required under Code §547(c)(1), whereas the Defendant is without evidence of the Debtor's intent.

The *Jones* court further ignores the micro-preference issue, *i.e.*, the effect of multiple claims to a common fund, by focusing merely on the defendant and the owner without taking other prospective defendants into account. *Jones,* at 103 ("whether, at the time of the preference payment, the owner still owed sufficient sums to the debtor on the project to permit a setoff against the owner's payment to the sub").

As a final matter, the *Jones* Court does not contemplate its decision to be

definitive.

> Other factual distinctions can also affect the viability of the new value defense. Like the §547(b)(5) lien, if the owner's setoff would not be permitted under state law; or if the setoff is not allowed under §553, then the owner's claim against the debtor becomes an unsecured claim for indemnity, and the transfer is not for "new value.

*Jones*, at 103-104.

### E.    <u>Defendant failed to meet its burden of proof.</u>

Code §§547(c)(1) and 547(a)(2) require that "new value" be measured in "money or money's worth." Defendant failed to prove the "money or money's worth" of its asserted new value. The evidence presented at trial for both the Dosher and Mayfaire jobs was that there were other subcontractors and suppliers on the job, although the amounts due other suppliers and subcontractors of the Debtor were never presented at trial to allow a valuation of any "new value" provided by Defendant. Daniel Rahe, who worked for the owner at Mayfaire, testified at trial that the claims of other Partitions subcontractors for the Mayfaire project who made bond and/or lien claims were eventually satisfied for less than the full amount each of those subcontractors claimed was due. (Appendix, 248) *See Callaway v. Kiddco, Inc. (In re Jacobsen Construction, Inc.)*, Adversary Proceeding No. 06-00028-5-ATS (Bankr E.D.N.C. March 26, 2007).  Dosher's representative, Kevin Houghton, stated that other subcontractors of the Debtor were owed money, but he could not state what was owed to them. (Appendix, 234-

235). The Debtor's bank accounts, as set out in the Statement of Facts above, clearly show that the majority of the funds from payments for the Mayfaire and Dosher projects did not come from payments on the projects to the Debtor, since the bank balances went to $100.00 and $0.00 prior the payment of the vast majority of Transfers.

Defendant's argument asserts that the general contractor at some point owed sufficient funds to the Debtor to pay Defendant's claim and these funds are sufficient to meet its burden of proof without any showing as to the value or validity of other claims on those funds, ignoring the "micro-preference" valuation issues and potential for diminution of the estate. Although Defendant relies on unexercised Chapter 44A remedies and unasserted bond claims, Defendant failed to meet its burden of proof under Code §547(g) by failing to show the interests of holders of other filed or unfiled Chapter 44A claims or bond claims in the contract balances that it asserts as the basis for its new value. The testimony of Daniel Rahe that some of these claims were settled for less than full value is evidence of the preferential effect of the Transfers.

That the Debtor made the payments from funds other than funds it received for work on the projects demonstrates that the surety did not have subrogation rights in the funds involved in the Transfers. Defendant's evidence as to hypothetical facts paints only a partial picture, failing to present evidence that

would prove to be definitive were the Court to require that a bond claim or lien claim be filed or asserted.

## III. **Defendant may not raise a defense under Code §546(c)(6) for the first time on appeal**.

In its Brief, Defendant argues that the transfers are subject to a defense under Code §547(c)(6).  [Brief, 49-50] This defense is not set out in the Answer (Appendix 8-16), or Defendant's Motion for Summary Judgment (Appendix 171-179), or considered by the Court at trial (Appendix 180-181). Issues raised for the first time on appeal are generally not considered absent exceptional circumstances. *Williams v. Prof'l Transp. Inc.*, 294 F.3d 607, 614 (4th Cir. 2002), *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 267 (4th Cir. Va. 2006).

## CONCLUSION

The Bankruptcy Court properly granted the Trustee's Motion for Summary Judgment in finding that Trustee had established that there were no genuine issues of material fact and the Transfers to Defendant were avoidable preferential transfers under Code §547(b) as a matter of law.

The Bankruptcy Court properly denied Defendant's defense under Code §547(c)(1)   to the avoidance of the Transfers after the trial of the adversary proceeding.   Even though Defendant was given full opportunity to present evidence to establish that it had would have immediately filed bond claim or lien claims had it not received the Transfers and the contract balance was sufficient to

pay Defendant in full, Defendant presented absolutely no evidence to meet the *Pennington* standard adopted by the Bankruptcy Court. Furthermore, this Court should reject the *Pennington* standard as an incorrect standard to be employed in determining new value based on payment of bonded claims under 11 USC §547(c)(1) and require that "new value" be based on the facts in the case, not speculation.

This Court should not consider Defendant's assertions of a defense under Code §546(c)(6) since the issue is raised for the first time on appeal.

The rulings of the Bankruptcy Court and the District Court should be affirmed by this Court, subject to rejection of the *Pennington* standard.

This the 1st day of June, 2009.

HOWARD STALLINGS FROM & HUTSON, P.A.

BY:    s/ James B. Angell
       James B. Angell
       NC State Bar No. 12844

       s/ Philip W. Paine
       Philip W. Paine
       N.C. State Bar No. 31710
       Attorneys for Trustee
       P.O. Box 12347
       Raleigh, NC 27605
       Telephone: (919) 821-7700
       Facsimile: (919) 821-7703
       Email: jangell@hsfh.com
              ppaine@hsfh.com

## **REQUEST FOR ORAL ARGUMENT**

The Trustee hereby requests oral argument pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure. This case requires a thorough examination of the provisions of North Carolina state laws in determining property interests and the resultant application of the provisions of the Bankruptcy Code at issue. The appeal is not frivolous and there is no authoritive opinion on the issue involved. Oral argument would assist the Court in determining the issues at hand by focusing the parties on the interplay between federal and state law and the vagaries of North Carolina lien laws.

HOWARD STALLINGS FROM & HUTSON, P.A.

s/ James B. Angell
James B. Angell
NC State Bar No. 12844

s/ Philip W. Paine
Philip W. Paine
N.C. State Bar No. 31710
Attorneys for Trustee
P.O. Box 12347
Raleigh, NC 27605
Telephone: (919) 821-7700
Facsimile: (919) 821-7703
Email: jangell@hsfh.com
        ppaine@hsfh.com

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

No.  09-1209          **Caption:**  United Rentals, Inc. v. James Angell, Trustee

**CERTIFICATE OF COMPLIANCE UNDER FED. R. APP.  P. 32(A)(7)**

COUNSEL MUST COMPLETE AND INCLUDE THIS CERTIFICATE IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.

1.      This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

☑      Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman).  Do NOT use sans serif typeface such as Arial or any font which does not have the small horizontal or vertical strokes at the ends of letters).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

   MS Word 2007, Times New Roman, 14 point

☐      Twelve point, monospaced typeface (such as Courier or Courier New).  Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier, 12 point):

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations; and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

☐      _____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

☑      13,963 _____ Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief)--*Some word processing programs, including certain versions of Microsoft Word, do not automatically count words in footnotes, making it necessary to manually add the word count from footnotes to obtain the total word count*; OR

☐      _____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation may result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief.

/s/ James B. Angell                          6/1/09
Signature of Filing Party                          Date

**ADDENDUM**

**SO ORDERED.**

**SIGNED this 17 day of April, 2009.**

J. Rich Leonard
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
NEW BERN DIVISION

IN RE:

SHEARIN FAMILY INVESTMENTS, LLC,

DEBTOR.                              CASE NO. 08-07082-8-JRL
                                     CHAPTER 11

### SUPPLEMENTAL ORDER

On March 18, 2009, this court, recognizing the need for an immediate resolution, entered a summary order allowing the joint motion to establish procedure for distribution of certain post-petition funds. The present order further outlines the court's reasoning for its finding that the claims of lien on funds were stayed by § 362 of the Bankruptcy Code.

### BACKGROUND

The debtor filed for relief under Chapter 11 of the Bankruptcy Code on October 13, 2008. Throughout its case, the debtor has operated as a debtor-in-possession developing a condominium project in Indian Beach, North Carolina known as the Nautical Club (the "Nautical Club Project"). Centurion Construction Company, Inc. ("Centurion") was hired to perform as the general contractor for the construction of the Nautical Club Project. On February 18, 2009, this court approved post-petition financing from the lender RBC Real Estate Finance, Inc.

("RBC") in the amount of $8,000,000.00 to complete construction. The portion of the post-petition financing owing to Centurion was $830,144.15. Centurion's only means for completing the project was to pay certain key subcontractors whose contributions were vital to finishing construction.

Between December 2008 and January 2009, subcontractors, including Vision Painting, Inc., Gouras, Inc., and Carpets by Thad, Inc. (the "Lien Claimants"), served the debtor with notices of claims of lien on funds in the approximate amount of $796,116.09. The Lien Claimants were not among those subcontractors Centurion contemplated paying from its post-petition financing budget. The Lien Claimants argued that their liens on funds, which were served post-petition, were actually effective from their commencement of work on the project pre-petition. The Lien Claimants further argued that should the court find otherwise, it would allow the debtor to unfairly pick and choose who it would pay since no "key subcontractors" served notice of claims of liens on funds pre-petition. The debtor asserted that it could disregard the claims of lien on funds pursuant to the automatic stay. By court instruction, the parties submitted memoranda of law on the issue of whether the rights of the Lien Claimants arising from the notices of claims of lien on funds were stayed by § 362 of the Bankruptcy Code. Upon review of the submitted memoranda, North Carolina state law, and the Bankruptcy Code, this court held that claims of lien served post-petition were stayed by § 362.

## DISCUSSION

Two types of Mechanic's liens involving real property are authorized by North Carolina law: 1) A Claim of Lien on Real Property; and 2) A Notice of Claim of Lien Upon Funds. A Claim of Lien on Real Property, pursuant to N.C.G.S. § 44A-8, is for the benefit of parties who contract directly with the owner of the property being improved. However, first, second, and

2

third tier subcontractors are not in direct contract with a property owner, dealing instead with the general contractor. Although subcontractors find themselves "down the chain," statutory provisions protect their interests by allowing those in the first through third tiers to assert a lien upon funds owed to the contractor with whom they dealt if they furnished labor, materials, or rental equipment to the site of the improvement. N.C.G.S. § 44A-18.

Pursuant to N.C.G.S. § 44A-20, once notice of a claim of lien on funds has been received, the obligor has a duty to retain funds subject to the lien, up to the amount of the lien claimed. An obligor may be the owner, a contractor, or subcontractor in any tier who owes money to another for performance on a contract to improve real property. N.C.G.S. § 44A-17(3). If the obligor fails to reserve the funds and makes a payment against the interest of the lien claimants, then the obligor becomes personally liable to the lien claimants for the amount of the wrongfully distributed payments not exceeding the lien. N.C.G.S. § 44A-20(b).

Following this line of reasoning, the Lien Claimants argued that the debtor, as the obligor of the Nautical Club Project and having received notice of the claims of lien on funds, must reserve approximately $796,116.09 from the $830,144.15 post-petition financing allotted to Centurion. The Lien Claimants failed, however, to take into account the automatic stay operating within the debtor's bankruptcy case.

The debtor filed its Chapter 11 petition in October, 2008. At the time of filing, the automatic stay under 11 U.S.C. § 362 came into effect. Section 362(a)(4) stays any action to create, perfect, or enforce any lien against property of the estate. An exception to the rule is carved out by § 362(b)(3), which allows perfection of a lien to "relate-back" to the time of lien creation. Retroactive perfection thus supersedes the rights of the trustee or hypothetical bona fide purchaser to the extent that the strong arm powers are subject to perfection under § 546(b)

3

or perfection is achieved within the grace period of § 547(e)(2)(A). 3 Collier on Bankruptcy (15th

ed. rev.) ¶362.03[6][a].  Here, the Lien Claimants did not fit the exception.  "Post-petition

perfection of a lien is permitted by the [Bankruptcy] Code but post-petition creation of a lien is

not." In re Kara Homes, Inc., 374 B.R. 542, 555 (Bankr. D. N.J. 2007); 11 U.S.C. §

546(b)(1)(A)-(B); 3 Collier on Bankruptcy (15th ed. rev.) ¶362.03[6] ("Under this provision, a

creditor may not take a security interest or create a. . . statutory lien on property of the estate."

(*citing,* United States v. Gold (In re Avis), 178 F.3d 718 (4th Cir. 1999)).

For purposes of this case, the linchpin is the time at which the lien was created or took

effect, thereby vesting the Lien Claimants' rights in the funds.  While both a lien on real property

and a lien on funds fall under the umbrella of N.C.G.S. § 44A, STATUTORY LIENS ON REAL

PROPERTY Art. 2, they are decidedly different in terms of when they become effective.  A claim

of lien on real property is created upon filing and perfection.  N.C.G.S. §§ 44A-11 & 12.

Perfection relates back to the effective date, the time at which the first material or laborer arrived

on the property site being improved. N.C.G.S. §§ 44A-10 & 11.  A lien on funds, however, "[i]s

perfected upon the giving of notice of claim of lien upon funds in writing to the obligor. . . and

*shall be effective* upon the obligor's receipt of the notice." N.C.G.S. § 44A-18(6) (emphasis

added).  Further, the statute creating the lien, N.C.G.S. § 44A-18(1), is written in the future

tense: "A first lien subcontractor. . . shall be entitled to a lien upon funds which are owed to the

contractor. . . ."  The text of the statute suggests that no lien arises until it is perfected by giving

written notice and made effective by receipt. N.C.G.S. § 44A-18(6); *also see,* Con Co, Inc. v.

Wilson Acres Apartments, Ltd., 56 N.C. App. 661, 665 (1982)(suggesting that a lien upon funds

4

is effective from notification). [1]

In re Excel Engineering, Inc., 224 B.R. 582 (Bankr. W.D. Ky. 1998), presents facts

similar to the present case. Louisville and Jefferson County Metropolitan Sewer District

("MSD") was the obligor on a construction project known as the Anna Marie Drive Drainage

Project. MSD hired Excel as the general contractor for the project, who in turn entered into an

equipment lease contract with Job Rentals. Under its contract with MSD, Excel procured an

indemnity bond to hold MSD blameless against claims of unpaid subcontractors. Approximately

nine months into the project, Excel filed for bankruptcy. Six days after the bankruptcy petition

was filed, Job Rentals filed a statement of lien against the construction project funds of MSD.

The court reasoned that § 362(b)(3) carved out an exception for perfecting or maintaining

perfection of an interest in property which existed at the time the bankruptcy was filed. Excel,

374 B.R. at 589. Since Job Rentals statement of lien was filed after the bankruptcy petition, it

was not only prevented from enforcing the lien but was in violation of the automatic stay. Id.

Simply put, an interest in property of the estate against which a lien is asserted must be

present pre-petition. Here, the Bankruptcy Code steps in and freezes rights where they stood at

the time the bankruptcy was initiated, before the Lien Claimants accrued any property interests.

---

[1]Section 44A-20 is in essence a third type of lien against real property, a "wrongful
payment of claim" lien. Section 44A-20 allows a subcontractor who has given notice of a claim
upon funds to obtain a lien on real property when the obligor is also the owner of the improved
property and payment to another party is made after notification. Under these circumstances, the
subcontractor is on the same footing as a general contractor, and perfection in this instance
would "relate back." However, in the present case, since the lien upon funds noticed post-
petition never took effect, the wrongful payment claim is also precluded. Furthermore, § 44A-20
requires that funds be wrongfully distributed. At the time the Lien Claimants notified the debtor,
no payment had been distributed against their interest.

The foregoing is an expanded explanation for the court's ruling on March 18, 2009, that the claims of lien on funds were stayed under § 362 of the Bankruptcy Code.

END OF DOCUMENT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

SLOUGH, SHARON F.                              CASE NO. 03-10520-8-JRL
         Debtor.                              Chapter 7

---

BRENDA WATTS
         Plaintiff,
v.                                             Adversary Proceeding
                                       No. L-04-00015-8-AP
SHARON SLOUGH and
STEPHEN H. SLOUGH,
         Defendants.


BRENDA WATTS
         Plaintiff,
v.                                             Adversary Proceeding
                                       No. L-04-00158-8-AP
SHARON SLOUGH, STEPHEN H.
SLOUGH, individually and as Trustee,
BRIAN K. SHEETS, and JEFFERY L.
SHEETS
         Defendants.


BRENDA WATTS
         Plaintiff,
v.                                             Adversary Proceeding
                                       No. L-04-00142-8-AP
SHARON SLOUGH and STEPHEN
H. SLOUGH,
         Defendants.

---

## ORDER

This matter is before the court on the trustee's Motion to Intervene, Motion to Invoke the

Automatic Stay and Motion to Dismiss. On March 8, 2005, the court conducted a hearing on this matter

1

in Wilson, North Carolina.

On October 20, 2003, the debtor filed a petition for relief under Chapter 7. Prior to the debtor's filing of the bankruptcy case, Brenda Watts ("Watts") filed notices of lis pendens and lawsuits in Cabarrus County and Brunswick County, North Carolina and Horry County, South Carolina against the debtor and others. The trustee subsequently removed those cases, and they are now pending before this court as adversary proceedings. The trustee seeks to intervene and be substituted as the party-plaintiff with respect to all fraudulent transfer claims in the three adversary proceedings. The trustee also seeks to be substituted for the debtor as counterclaimant in the case removed from Horry County.

Cabarrus County Case

On March 28, 2002, Watts filed a notice of lis pendens and complaint in Cabarrus County against the debtor, the debtor's husband, Stephen Slough, and the debtor's sons, Brian K. Sheets and Jeffery L. Sheets. The complaint alleges various claims, including: (1) violations of N.C. Gen. Stat. §§ 78A-24 and 78A-56(a) for selling unregistered securities to the plaintiff; (2) violations of N.C. Gen. Stat. §§ 78A-36(a) and 78A-56(a) for selling securities without a license; (3) violations of N.C. Gen. Stat. §§ 78A-8 and 78A-56(a) for fraudulently selling securities; (4) breach of fiduciary duties to Watts in the sale of securities to her; (5) unfair and deceptive trade practices, pursuant to N.C. Gen. Stat. §§ 75-1.1, 75-16, 75-16.1; (6) fraud; (7) negligent misrepresentations; and (8) violations of N.C. Gen. Stat. §§ 39-23.4 and 39-23.5 for fraudulent transfers. The eighth claim is one of the fraudulent transfer claims to which the trustee seeks to be substituted as party-plaintiff. That claim alleges that the debtor fraudulently transferred real property located in Kannapolis, North Carolina, to Brian and Jeffery Sheets, the debtor's two sons. Thereafter, the two sons allegedly transferred the property to Stephen Slough, in his capacity as trustee over a trust

2

established by the two sons.

On December 9, 2002, the Superior Court of Cabarrus County entered a judgment in favor of the plaintiff for approximately $226,430.50 on the above-named counts 1 and 2 and for the defendants on the above-named counts 4 and 7. When the debtor filed her bankruptcy case, this order was the subject of a pending appeal. This case was removed to the U.S. Bankruptcy Court for the Middle District of North Carolina and transferred to this court, where it is pending as Adversary Proceeding No. 04-00158-8-JRL.

Horry County Case

In Horry County, South Carolina, Watts filed a notice of lis pendens on January 16, 2003. Thereafter, on February 4, 2003, Watts filed a complaint against the debtor and Stephen Slough. In the complaint, Watts (1) seeks enforcement of a judgment obtained in Cabarrus County and (2) alleges that the debtor fraudulently transferred her interest in the Verandas Condominium to herself and her husband, in violation of S.C. Code Ann. § 27-23-10(A). This second claim is one of the fraudulent transfer claims to which the trustee seeks to be party-plaintiff.

The defendants asserted a counterclaim, alleging that the lis pendens is a slander of their title to their property. They allege that the lis pendens resulted in a failed contract for the sale of the property in the amount of $360,000. They assert actual damages in the amount of $360,000 plus punitive damages.

The trustee removed this case to the U.S. Bankruptcy Court for the District of South Carolina, which then transferred the case to this court. It is pending as Adversary Proceeding No. 04-00142-8-JRL.

3

Brunswick County Case

On January 28, 2003, Watts filed a notice of lis pendens in Brunswick County, and she filed a complaint against the debtor and Stephen Slough on February 4, 2003. The complaint asserts that the defendants fraudulently acquired tenancy by the entireties property in Brunswick County, North Carolina with the proceeds of a loan secured by property owned by the defendants in Horry County, South Carolina as tenants in common. Watts asserts that this course of action (1) violated N.C. Gen. Stat. §§ 39-23.4 and 39-23.5 or S.C. Code Ann. § 27-23-10(A) and (2) violated N.C. Gen. Stat.

§ 75-1.1 as unfair and deceptive trade practices arising out of the fraudulent transfer. Both of these claims constitute fraudulent transfer claims to which the trustee seeks to be party-plaintiff. The trustee removed the case to this court where it is pending as Adversary Proceeding No. 04-00015-8-JRL.

ANALYSIS

The Court lifted the automatic stay upon entry of a scheduling order.

The trustee moves the court to invoke the automatic stay, pursuant to 11 U.S.C. § 362, to preclude Brenda Watts from pursuing her claims in this action. In response, Watts argues that the trustee acquiesced to Watts' prosecution of the claims when he declined to be substituted as party-plaintiff at a status conference held July 20, 2004. On July 27, 2004, the court entered a scheduling order, which consolidated the cases for pretrial proceedings and provided a time line for discovery, mediation, motions, a pretrial conference, and a trial. The trustee asserts that he had no authority to lift or waive the automatic stay and that the scheduling order did not have the effect of lifting the automatic stay. He further asserts that a party seeking relief from the automatic stay must file a motion and provide notice and opportunity to be heard.

4

In June 2004, Watts moved the court for a status conference, and the court granted the motion. At the July 20, 2004 status conference, the court specifically asked the trustee whether he needed to become the plaintiff in these cases. The trustee answered by saying that he was not certain where his loyalties lay, as he had solely focused his efforts on removing and transferring the cases to this court. With that said, the court proceeded with a schedule for the cases. No one objected to the entry of a scheduling order to move these cases forward.

While § 362(d) states that a stay can be lifted "after notice and a hearing," it means "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A); Powers v. American Honda Finance Corp., 216 B.R. 95, 97 (N.D.N.Y. 1997)(no separate evidentiary hearing required before court lifted stay). Here, the court noticed and held a status conference. Those interested had an opportunity to be heard regarding the progression of the cases. Moreover, the purpose of the automatic stay was accomplished when the trustee removed and transferred Watts' cases to this forum. The purpose of the automatic stay is "to insure that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another." Fidelity Nat'l Title Ins. Co. v. Bozzuto, 227 B.R. 466, 470 (E.D.Va. 1998)(quoting A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 998 (4th Cir. 1986)).

For these reasons, the trustee's Motion to Invoke the Automatic Stay is denied. The court finds that it implicitly lifted the automatic stay when it entered a scheduling order after the July 20, 2004 status conference.

<u>The trustee succeeds to Watts' fraudulent transfer claims under 11 U.S.C. § 544(b) and</u>

<u>debtor's counterclaim under 11 U.S.C. § 541(a)(1).</u>

The trustee further argues that, pursuant to 11 U.S.C. § 544(b), he succeeds to any cause of action against the debtor to avoid the transfer of property that is voidable by an unsecured creditor. The trustee asserts that Watts is an unsecured creditor, as her filing of the notices of lis pendens in Cabarrus, Brunswick and Horry County did not secure her claims. Watts argues that the notices of lis pendens created unavoidable secured positions in the fraudulently transferred property and that her position is superior to that of the trustee.

Section 544(b) of the Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . ." 11 U.S.C. § 544(b). Thus, when an unsecured creditor can reach an asset of the debtor outside bankruptcy, the trustee can utilize § 544(b) to obtain that asset for the estate. <u>In the Matter of Leonard</u>, 125 F.3d 543, 544 (7th Cir. 1997). The trustee then divides the asset among all of the unsecured creditors. <u>Id.</u>

The issue before the court is whether Watts has a sufficient interest in the underlying real property to overcome the provisions of § 544(b). <u>In the Matter of Leonard</u>, 125 F.3d 543 (7th Cir. 1997) presented similar facts whereby creditors brought a fraudulent conveyance action against an individual in state court. The individual, thereafter, filed for relief under Chapter 7, and the trustee removed the creditors' fraudulent conveyance action to bankruptcy court. <u>Id.</u> at 544. The creditors requested the court to order the trustee to abandon the property. <u>Id.</u> They argued that they had a security interest in the

6

underlying property as a result of bringing the action and filing a notice of lis pendens. Id. The court

concluded that the matter was governed by § 544(b), and that the trustee had properly succeeded to the

creditors' interests. Id. at 544-546. Under Illinois law, the creditors did not have a security interest in the

property. Id. at 545. The filing of a notice of lis pendens did not create a lien against the property; rather,

it notified purchasers of the land that there may be a superior interest in the property. Id. The court further

rejected the argument that an equitable lien was created, reasoning that the mere filing of a suit could not

create an equitable lien when the law specifically provided a method for attaching property and obtaining

a lien. Id. at 546.

In North Carolina, a notice of lis pendens does not create a lien on property; rather, it serves as

constructive notice of pending litigation. N.C. Gen. Stat. § 1-118; Hill v. Pinelawn Memorial Park, Inc.,

304 N.C. 159, 164, 282 S.E.2d 779, 782-783 (N.C. 1981). Statutory procedures exist for obtaining

a lien through attachment prior to receiving a judgment in the litigation. N.C. Gen. Stat. §§ 1-440.1-

1.440.46. An actual judgment lien is not created or perfected until a judgment is docketed. N.C. Gen.

Stat. § 1-234; In re Wilmington Nursery Company, Inc., 36 B.R. 813, 816 (Bankr. E.D.N.C. 1984).

Like North Carolina, a notice of lis pendens under South Carolina law does not create a lien against the

real property at issue. It simply puts third parties on constructive notice that a piece of property is subject

to litigation. S.C. Code Ann. § 15-11-20; Pond Place Partners, Inc. v. Poole, 351 S.C. 1, 16-17, 567

S.E.2d 881, 889 (S.C. Ct. App. 2002).

Thus, under both North Carolina and South Carolina law, the mere filing of a lawsuit and notice

of lis pendens does not create a security interest in the underlying property. The court distinguishes this

case from In re Medlin, 229 B.R. 353 (Bankr. E.D.N.C. 1998). In the Medlin case, the creditor filed a

notice of lis pendens prior to the 90-day preference period and then obtained a judgment during the 90-day preference period. The court concluded that the judgment could not be avoided. Id. at 360. Unlike this case, the creditor in Medlin obtained a judgment lien against the property that related back to the filing of the notice of lis pendens. Id.  Here, even though Watts filed notices of lis pendens well before the 90-day preference period, she never obtained a secured interest in the property.

For the foregoing reasons, the court grants the trustee's Motion to Intervene. The trustee is substituted as party-plaintiff regarding the fraudulent transfer claims in the three adversary proceedings pursuant to § 544(b), and Watts is dismissed as party-plaintiff regarding the fraudulent transfer claims. In addition, pursuant to § 541(a)(1), the trustee succeeds to the debtor's counterclaim against Watts in the case removed from Horry County (Adv. Proceeding No. 04-00142-8-JRL).

**So Ordered.**

**Dated:**          **March 24, 2005**

                                        S/ J. Rich Leonard
                                        **J. Rich Leonard**
                                        **United States Bankruptcy Judge**

8



**SO ORDERED.**

**SIGNED this 26 day of March, 2007.**

_A. Thomas Small_
**A. Thomas Small**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

IN RE:                                                   CASE NO.

JACOBSEN CONSTRUCTION, INC.                              04-03490-5-ATS

    DEBTOR


JOSEPH N. CALLAWAY, Trustee

    Plaintiff                                      ADVERSARY PROCEEDING NO.

    v.                                             S-06-00028-5-AP

KIDDCO, INC.

    Defendant.


## ORDER ALLOWING PARTIAL SUMMARY JUDGMENT

The matter before the court in this adversary proceeding brought by Joseph N. Callaway, trustee

for the chapter 7 debtor, Jacobsen Construction, Inc., to recover pursuant to 11 U.S.C. § 547(b), or

alternatively pursuant to 11 U.S.C. § 548(a)(1), payments totaling $111,270.34, made by Jacobsen

Construction, Inc. to the defendant, Kiddco, Inc., is the plaintiff's motion for partial summary judgment. The

plaintiff is seeking in this motion to recover only one of the payments in the amount of $55,625.27, and is

proceeding only pursuant to § 547(b).  A hearing took place in Raleigh, North Carolina on January 30, 2007.

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.  This is a "core proceeding" within the meaning of 28 U.S.C. §§ 157(b)(2)(F) and (H), which this court may hear and determine.

Jacobsen Construction, Inc. was the general contractor pursuant to a construction contract  with Wake Technical Community College, dated January 27, 2003, to construct the Wake Tech Automotive and Heavy Equipment Technology Complex.  Kiddco, Inc. was a subcontractor pursuant to a subcontract with Jacobsen, dated April 7, 2004, and signed on April 12, 2004, to perform grading and grading-related construction services at the project.  Def. Ex. 4.  The general contract between Jacobsen and Wake Tech and North Carolina General Statute § 44A-26 required a bond that was provided by the Developers Surety and Indemnity Company to assure performance and the payment of subcontractors.

Kiddco performed grading work under the subcontract and issued its first invoice to Jacobsen in the amount of $90,625.27 on May 7, 2004. Although the subcontract called for payment in 30 days, the invoice erroneously stated that the payment was due in 15 days.  Jacobsen made a partial payment of $35,000 on June 8, 2004, leaving an unpaid balance of $55,625.27.  Kiddco was concerned that the full amount of the invoice was not paid and threatened to leave the job if it did not receive payment for the full amount of the invoice. Jacobsen delivered a $55,625.27 check to Kiddco on June 29, 2004, and although Kiddco had begun to "demobilize" on June 25, with the payment on June 29, Kiddco stayed on the job and was still on the job when Jacobsen stopped work on August 5, 2004. Kiddco issued 2 more invoices, one on June 2, 2004, in the amount of $102,366.70 and one on July 28, 2004 in the amount of $113,878.76, but Jacobsen made no other payments to Kiddco on the Wake Tech project.[1]  The bonding company,

---

[1] Jacobsen did make payments to Kiddco on two other projects.  Those payments are the subject of this adversary proceeding, but are not part of this motion for summary judgment.

Developers Surety and Indemnity Company, completed the construction work for Wake Tech and employed Kiddco to do extra work not contemplated by the original contract. On October 11, 2004, Kiddco and the surety executed a ratification agreement that contained mutual releases, including a release by Kiddco to the surety for liability for the Kiddco invoices paid by Jacobsen. Affidavit of Tom Kidd, Ex. 1. Kiddco received partial payment from the bonding company for the outstanding two invoices. Def. Ex. 3, Defendant's Answer to Interrogatory #14.

Jacobsen filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on September 24, 2004, and Mr. Callaway was appointed trustee. The trustee contends that he is entitled to summary judgment because there is no genuine issue with respect to the requirements of § 547(b) and the defendant has offered no facts supporting its defenses.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v.Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 82 S. Ct. 993 (1962). Summary judgment should not be granted unless the moving party establishes his right to judgment "with such clarity as to leave no room for controversy." Portis v. Folk Constr. Co., Inc., 694 F.2d 520, 522 (8th Cir. 1982).

11 U.S.C. § 547(b) states:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made--
        (A) on or within 90 days before the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if--
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not yet been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Kiddco's first defense is that § 547(b) is inapplicable because there was no transfer to Kiddco of "an interest of the debtor in property." Specifically, Kiddco argues that the $55,625.27 payment was not "an interest of the debtor in property" because the funds from which the payment was made were subject to a trust in favor of Kiddco and Jacobsen's other subcontractors. According to Kiddco, the funds paid by the project owner (Wake Tech) to the general contractor (Jacobsen) are subject to a trust in favor of the subcontractors (including Kiddco). Kiddco maintains that Jacobsen was merely a conduit for payments made by Wake Tech. Although in some states, for example the state of Michigan, funds paid to a general contractor are held in trust, see Mich. Comp. Laws § 570.151 (2006), no such trust is created under North Carolina law. North Carolina General Statute § 22C-3 requires a general contractor to pay subcontractors within seven days from the receipt of payment by the general contractor, Statesville Roofing & Heating Co. v. Duncan, 702 F. Supp. 118 (W.D.N.C. 1988), but that statute does not create a trust. Furthermore, no trust is created by the terms of the general contract, which, like the North Carolina statute, requires payment in seven days, or by the terms of the subcontract, which requires payment in 30 days. In the absence of a trust, the funds owed to a general contractor in bankruptcy do not belong to the subcontractors and are part of the general contractor's bankruptcy estate. Grochal v. Ocean Technical Services Corp. (In re Baltimore Marine Industries), 476 F.3d 238 (4th Cir. 2007). There being no trust, the payment made to Kiddco was a "transfer of an interest of the debtor in property" as that term is used in § 547(b).

It is not contested that the trustee has established the elements of a preferential transfer under § 547(b)(1) through (4). There was a transfer (payment of $55,625.27) for or on account of an antecedent debt (invoice for worked performed), owed by the debtor before the transfer was made, while the debtor was insolvent (unrebutted presumption of § 547(f)) within 90 days (on June 29, 2004) before the filing of the petition (on September 24, 2004).

4

Kiddco, however, does contend that the trustee has not established the requirement under § 547(b)(5) that the payment enabled Kiddco to receive more than it would have received in a chapter 7 case had the payment not been made. Kiddco argues that had the payment not been made by Jacobsen, it would have been paid in full pursuant to the bond. According to Kiddco, its claim would be satisfied whether or not it was paid by Jacobsen and whether or not Jacobsen was a debtor in chapter 7. First of all, it is by no means certain that Kiddco would have been paid in full by the bonding company if it had made good its threat to leave the job. In fact, it received only partial payment from the bond for its two outstanding invoices.

The United States District Court for the Eastern District of North Carolina was confronted with a similar issue under § 547(b)(5) in which a subcontractor, by accepting payment from a contractor, gave up its inchoate right to file a mechanics and materialman's lien. In that case the subcontractor did not prevail. Precision Walls, Inc. v. Crampton, 196 B.R. 299 (E.D.N.C. 1996). Kiddco had no lien rights, inchoate or otherwise, with respect to property of the debtor and gave up no lien rights by accepting payment. The bonding company would have had subrogation rights against Jacobsen if Kiddco had made a claim against the bonding company and if the bonding company had paid Kiddco, but those facts are even further removed from the circumstances that the court found did not support the subcontractor's contention under § 547(b)(5) in Precision Walls.

From the perspective of the debtor's estate, the debtor was insolvent and had insufficient funds to pay all creditors in chapter 7. Kiddco, as already stated, had no specific claim to funds that Jacobsen received from Wake Tech, and, absent the $55,625.27 payment, there were not sufficient assets in the bankruptcy estate to pay that amount to Kiddco. For purposes of applying § 547(b)(5), the court must look to the availability of assets of the estate, not the assets of a bonding company or a third party guarantor. Accordingly, the trustee has meet all of the requirements of § 547(b).

Kiddco also asserts three affirmative defenses under § 547(c)(1), § 547(c)(2) and § 547(c)(4).

Section 547(c)(1) provides that a preferential transfer may not be avoided to the extent the transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a

5

contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1).

Section 547(a)(2) defines "new value" for purposes of § 547 as being

money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C. § 547(a)(2).

Kiddco contends that it provided contemporaneous new value in two ways. First, it maintains that it provided new value by not leaving the job site, and second, it provided new value by giving up its claim against the bonding company. Neither contention is persuasive.

Remaining on the job to do work in the future for which it expects to be compensated does not fit within the definition of new value under § 547(a)(2). Furthermore, work to be performed in the future would not be contemporaneous. In this case most, if not all, of Kiddco's work, according to Kiddco's three invoices, was performed before the date of the payment, June 29, 2004. Future work may give rise to a defense under § 547(c)(4), which permits new advances made after the transfer, in some circumstances, to be set off against the preferential transfer, but the future work is not new value under § 547(c)(1).

Kiddco's second argument under § 547(c)(1) is that by accepting the payment it was relinquishing its claim against the bonding company. According to Kiddco, if it had made a claim against the bonding company, the bonding company would have paid Kiddco and the bonding company would have had a claim against Jacobsen's assets, including a claim by subrogation to all sums owing to Jacobsen by Wake Tech arising from the project.

Kiddco cites in support of its position the case of O'Rourke v. Coral Construction, Inc. (In re E.R. Fegert, Inc.), 887 F.2d 955 (9th Cir. 1989), decided by the United States Court of Appeals for the Ninth Circuit. In Fegert, the court held that two subcontractors gave new value for purposes of § 547(c)(1) by accepting payment from their general contractor and thereby giving up their claims against the bonding

6

company. That may have constituted new value under the facts of that case, but all of the facts were not recited in the opinion. In the adversary proceeding before this court, Kiddco has not shown that by giving up its claim, it would have been paid in full. In fact, as previously stated, Kiddco was not paid in full by the bonding company for all of the work it performed for Jacobsen. In Fegert, the subcontractors, the contractor and the bonding company were all part of a lawsuit that was pending at the time of the payment. In this case there is no evidence that Kiddco had even contacted the bonding company at the time of the payment.

In Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232 (1962), relied upon by the Ninth Circuit in Fegert, the Supreme Court held that a bonding company that has paid claims of subcontractors is subrogated to funds due to the contractor by the owner of the project. In the adversary proceeding before this court, the funds from which the payments were made to Kiddco came from a payment made by the owner, Wake Tech, to Jacobsen. Kiddco's argument assumes that if it had not been paid by Jacobsen it would have immediately made a claim against the bonding company and that the bonding company would have immediately paid the claim and become subrogated to funds, previously paid and to be paid to Jacobsen by Wake Tech, sufficient to pay the claims of Kiddco and the other project subcontractors. Those assumptions are entirely too speculative. The court will not speculate that Kiddco would have immediately made a claim, that the bonding company would immediately pay the claim, and that the bonding company would have been subrogated to sufficient assets, including past and future payments from Wake Tech, to pay Kiddco and the other subcontractors in full.[2] For these reasons Kiddco has not presented facts that support its defense under § 547(c)(1).

---

[2] This court rejected a similar argument under § 547(c)(1) in the previously mentioned adversary proceeding, Precision Walls, Inc v. Crampton (In re The Accord Group, Inc.), Case No. 93-01865-5-ATS (Bankr. E.D.N.C. June 28, 1995), where a subcontractor released inchoate lien rights by accepting payment from the contractor. The court's holding is referred to in the district court's decision in Precision Walls, Inc. v. Crampton, 196 B.R. 299 (E.D.N.C. 1996), but there was no appeal from that part of this court's ruling. In the present adversary proceeding, Kiddco had no lien rights to waive.

Kiddco also has not supported its defense under § 547(c)(2). Section 547(c)(2) provides that the trustee may not avoid a transfer under § 547 to the extent that the transfer was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

Kiddco engaged in extraordinary conduct by threatening to leave the job if it was not paid by Jacobsen. Had the payment been in the ordinary course of business it would not have made that threat. Kiddco may not prevail on its § 547(c)(2) defense, because the payment was not in the ordinary course of its buisness.

Finally, Kiddco's answer to its complaint raises an affirmative defense under § 547(c)(4), which provides that the trustee may not avoid a transfer under § 547 to the extent that the transfer was

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor --
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4).

Kiddco has not pursued this defense either in its brief or in its oral presentation. Furthermore, it appears from the record, as previously stated, that most if not all of the work that Kiddco performed for Jacobsen was done prior to the date of payment, June 29, 2004. Accordingly, Kiddco cannot prevail under § 547(c)(4).

To summarize, the trustee has established all of the elements of § 547(b) and Kiddco has not established the elements of its defenses under § 547(c)(1), § 547(c)(2) or § 547(c)(4), and the court concludes that the trustee's motion for partial summary judgment shall be **ALLOWED**.

**SO ORDERED**.

## END OF DOCUMENT

8

**SO ORDERED.**

**SIGNED this 20 day of March, 2008.**

J. Rich Leonard
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

**IN RE:**

| | |
|---|---|
| **PARTITIONS PLUS OF WILMINGTON, INC., D/B/A PARTITIONS, INC., D/B/A STORM PROTECTION SYSTEMS,** | **Case No. 04-06776-8-JRL** <br> **Chapter 7** |

Debtor.

| | |
|---|---|
| **JAMES B. ANGELL, CHAPTER 7 TRUSTEE FOR PARTITIONS PLUS OF WILMINGTON, INC., D/B/A PARTITIONS, INC., D/B/A STORM PROTECTION SYSTEMS,** | **Adversary Proceeding No.** <br> **L-06-00148-8-AP** |

Plaintiff,

    **v.**

**RAY J. PENNINGTON, INC. and RAY J. PENNINGTON,**

Defendant.

---

<u>ORDER</u>

This case is before the court on the complaint of James B. Angell, chapter 7 trustee for

Partitions Plus of Wilmington, Inc., against Ray J. Pennington, Inc. and Ray J. Pennington

("Defendant") to avoid certain preferential transfers and to recover such transfers for the benefit of

the estate. On February 27, 2008, a trial was held in Raleigh, North Carolina.

### FACTS AND BACKGROUND

Partitions Plus of Wilmington, Inc. filed a chapter 11 bankruptcy petition on September 1, 2004. The case was converted to one under chapter 7 on November 9, 2004. Prior to the debtor's bankruptcy filing, Defendant worked as a sub-subcontractor for the debtor on several jobs. Within ninety days prior to the debtor's bankruptcy filing, Defendant received three checks from the debtor totaling $7,305.48.

On July 14, 2006, the trustee filed this adversary proceeding, and an amended complaint was later filed on August 23, 2006. The amended complaint alleges that the three payments to Defendant constitute preferential transfers. Defendant answered by asserting, *inter alia*, that the payments could not be avoided because they were a contemporaneous exchange for new value given to the debtor under 11 U.S.C. § 547(c)(1). Both parties filed summary judgment motions. The court's order resolving these motions concluded that the three payments were preferential transfers under § 547(b). Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. June 11, 2007). In addressing Defendant's new value defense for payments arising out of projects involving government-required payment bonds and surety bonds,[1] the court held that Defendant did not establish a new value defense at that time, but that it could later do so

---

[1]Defendant previously established that the three preferential payments were made on account of work performed on projects that were divisible into three categories: (1) government projects with government-required payment bonds; (2) public projects with surety bonds; and (3) materialman's lien rights projects. For payments resulting from projects involving materialman's lien rights, the court held that Defendant could not establish a valid new value defense because it had no lien rights with respect to the property of the debtor pursuant to Precision Walls, Inc. v. Crampton, 196 B.R. 299 (E.D.N.C. 1996), since it never perfected its lien and gave up nothing by accepting payment.

by presenting sufficient evidence that (1) it would have timely filed a claim against the project bond had it not received payment from the debtor, and (2) at the time, the debtor was still owed funds by the general contractor on which the bonding company could have asserted a lien. Id.

Both parties again filed cross-motions for summary judgment addressing this issue. In support of its claim that it would have filed a bond claim had it not received the preferential payment, Defendant presented evidence that (1) it filed a bond claim in the only other instance in which the debtor did not tender payment to the Defendant, and (2) the bonding company paid this claim in full. The trustee contended that this evidence was too speculative to establish as a matter of law that Defendant would have filed a timely bond claim in these other instances. The court ruled that Defendant's evidence was sufficiently corroborative of its likely conduct to create a genuine issue of material fact, but that it was insufficient to sustain its defense as a matter of law. Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. December 3, 2007).

## ANALYSIS

### I. New Value Defense – Background

The Bankruptcy Code provides that a trustee may avoid a pre-petition transfer of a debtor's property, if it is shown that the transfer was:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made . . . on or within the 90 days before the date of the filing of the petition . . .; and
> (4) that enables such creditor to receive more than such creditor would receive if
> > (A) the case were a case under chapter 7 of this title;
> > (B) the transfer had not been made; and
> > (C) such creditor received payment of such debt to the extent provided by the

3

provisions of this title.

11 U.S.C. § 547(b). The legislative history of the preference statute reveals its two-fold purpose:

> First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before the bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation of all his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received greater payment than others of his class is required to disgorge so that all may share equally.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6138.

Certain transfers that would otherwise qualify as preferential transfers are often made for purposes that do not frustrate § 547(b)'s goals, and the Code exempts these transfers from the trustee's avoidance power. See § 547(c)(1)-(5). This case is concerned solely with the "contemporaneous exchange of new value" defense under § 547(c)(1). According to § 547(c)(1), a trustee may not avoid a preferential transfer "to the extent that such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." As used § 547(c)(1), "new value" is defined as

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2). The primary justification for the new value exception is that the transfer of new value to the debtor will offset the payment and, therefore, the bankruptcy estate will not be depleted to the detriment of other creditors. 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6-

4

25, at 592 (1st Cir. 1992).

## II. The "Indirect Transfer" Theory

The new value defense is frequently raised in cases in which a general contractor has filed for bankruptcy relief. In this context, subcontractors who received alleged preference payments defend the preference suit by invoking a specific theory of the new value defense – the "indirect transfer" theory.[2] In its purest form, the "indirect transfer" theory is premised on the following assumption: had a debtor general contractor not paid a subcontractor for work performed on a project secured by a payment bond, the subcontractor would have filed a bond claim. The bonding company, who would be forced to pay the subcontractor, would then seek indemnification from the owner for funds owed to the debtor general contractor. In re J.A. Jones, Inc. 361 B.R. at 102. The crux of the "indirect transfer theory" is that the debtor general contractor's estate is not diminished to any greater degree by the preferential payment to the subcontractor than it would have been had the subcontractor enforced its right to collect on the project bond and prevented the funds from ever reaching the debtor's estate.

### A. Prima Facie Case

In order to establish a valid new value defense using an "indirect transfer" theory in a case involving a subcontractor, a defendant must show that (1) it would have timely filed a claim against the project's payment bond and been paid in full had it not received payment from the debtor, and (2) at the time, the debtor was still owed funds by the general contractor on which the bonding

---

[2] In re J.A. Jones, Inc., 361 B.R. 94 (Bankr. W.D.N.C. 2007) summarized the "indirect transfer" theory in the context of the release of a subcontractor's lien rights as new value. Although this case involves the release of a subcontractor's bond claim as opposed to lien rights, the "indirect transfer" theory is equally applicable. See Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. June 11, 2007).

company could have asserted a lien.

B. First Element: Filing of a Bond Claim and Payment in Full

Although this framework is seemingly straightforward, application of the first element can be particularly difficult because proving that a subcontractor would have timely filed a bond claim and been paid in full by the bonding company requires a degree of speculation since a subcontractor can only hypothesize as to what actions it would have taken. In re J.A. Jones, Inc., 361 B.R. 94 (Bankr. W.D.N.C. 2007) attempted to remove the uncertainty of this speculation in the context of a release of lien rights by adopting an objective approach that asks "what would a reasonable materialman have done in response to that nonpayment." Id. at 103. With little difficulty, the court concluded that a "reasonable subcontractor would assert his legal rights, liening the project, perfecting those liens and forcing payment through the owner." Id.

The court finds this objective approach problematic for two reasons. First, it relieves the subcontractor of the burden of proving a necessary element of its defense. A party asserting a new value defense has the burden of proving each element. 11 U.S.C. § 547(g). However, assuming, as the objective approach does, that a reasonable subcontractor would file a timely bond claim effectively eliminates the subcontractor's burden of proof regarding this issue.

The second and perhaps most troubling problem with the objective approach is that it is not always entirely clear how a reasonable subcontractor would react to nonpayment. Subcontractors that have appeared before this court have stated that they do not always file timely claims when faced with nonpayment. Their primary justification is that they do not want a reputation of being unyieldingly harsh in their business dealings. These subcontractors assert that it is difficult, especially in competitive markets, to maintain good business relationships with general contractors

6

if the general contractor fears that the subcontractor will file a bond or lien claim based on the slightest delinquency in payment. For these reasons, the court finds the objective approach unworkable.

A subjective approach, on the other hand, remedies both problems of the objective approach. First, it remains consistent with § 547(g) by keeping the burden of proving each element of the new value defense on the subcontractor. Second, it eliminates the objective approach's assumption that reasonable subcontractors would always file a bond claim and replaces it with a requirement of competent proof of the subcontractor's intention. The subjective approach, admittedly, requires some amount of speculation. Given the proper evidentiary showing, however, a subcontractor can sufficiently negate speculation with respect to the actions it would have taken to meet its burden of proof.

The question remains: just how much evidence is necessary to make this showing? The evidentiary requirement differs depending on the stage of the litigation. In the summary judgment context, a subcontractor must present evidence beyond its own unsupported assertion that it would have filed a bond claim. See Callaway v. Kiddco, Inc. (In re Jacobsen Constr., Inc.), Adv. Pro. S-06-00028-5-AP (Bankr. E.D.N.C. March 26, 2007). For example, a subcontractor could show that it filed bond claims in the only other instances in which the debtor did not tender payment to the defendant. Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. December 3, 2007). Practice in the industry, or conduct with regard to other general contractors, may be relevant.

The proof requirement obviously increases as the litigation progresses to trial. Although there is no controlling authority listing the quantum of evidence necessary to make this showing, the

7

court finds that Defendant's cumulative evidence in this case is sufficient to establish that it would have filed a bond claim had it not been paid. First, Robert L. Pennington, one of Defendant's two employees, testified that it is Defendant's general practice of over twenty years to file bond claims if faced with nonpayment. In fact, Pennington testified that Defendant collects in full on 98% of all overdue invoices, and that the only invoices for which it does not collect in full are those in which it credits the general contractor for a specific reason. This testimony seems to imply that Defendant collects, by some method, on 100% of all overdue invoices. Additionally, as noted in a previous order, Defendant filed a bond claim and was paid in full in the only instance of nonpayment by this debtor. That Defendant took action consistent with its stated intentions is indicative that it likely would have taken the same course of action had it earlier been faced with nonpayment.[3] Finally, Pennington testified at trial that he personally addresses all overdue invoices in a manner the protects Defendant's right to timely file liens or bond claims. Pennington testified that it is his policy to address all invoices that are overdue by at least ninety days in order to keep track of the invoice in case it becomes necessary to file a lien or bond claim by the 120th day, the last day in which such lien or bond claims are often permitted. This policy only adds further support to Defendant's claim. While no single piece of Defendant's evidence would have been sufficient, by itself, to carry the burden of establishing the new value defense, Defendant's evidence, taken as a whole, amply supports its contention that it would have filed a bond claim had it not been paid.

That Defendant has convinced the court that it would have filed a bond claim had it not

---

[3]The court is well aware that future subcontractors attempting to establish a similar new value defense may not have faced the necessity of filing a previous bond claim. In no way does the court's opinion today establish the requirement that a subcontractor have filed a bond claim. Instead, this particular fact is used only in conjunction with the other facts in order to most accurately predict how Defendant would have reacted.

received the preferential payments does not fully resolve the issue, however. Defendant must further show that its bond claim would have been paid in full. In this case, Defendant submitted evidence that it was, in fact, paid in full for a subsequent bond claim in this project. In light of the trustee's lack of contradictory evidence, this court has no reason to believe that a solvent bonding company that later paid a bond claim in full would have been unable or unwilling to pay a prior bond claim in full as well. Based on the foregoing evidence, the court concludes that Defendant has established that it would have filed a bond claim had it not received the preferential payments, and that the bonding company would have paid the bond claim in full.

C. Second Element: Money Available for Bonding Company To Assert Lien

The second element of the "indirect transfer" theory is that the subcontractor must prove that the debtor general contractor was still owed money on which the bonding company could have asserted a lien. Without this evidence, the "indirect transfer" theory fails because the subcontractor's release of its bond claim would have no value if the bonding company was unable to enforce the debtor general contractor's obligation on the payment bond. In most cases, the viability of an "indirect transfer" theory appears to hinge on this factor. In re J.A. Jones, Inc. 361 B.R. at 103; see also Askenaizer v. Seacoast Redimix Concrete, LLC (In re Charwill Constr., Inc.), 2007 Bankr. LEXIS 4379 (Bankr. D.N.H. Dec. 21, 2007).

In this case, Defendant's evidence consists of (1) the fourteen invoices whose payments are the subject of this preference action, and (2) Defendant's answers to the trustee's first set of written interrogatories, which contain Defendant's uncontradicted statements that the debtor received certain disbursements after the invoice dates. Defendant asserts that the bonding company could have asserted a lien on these disbursements. However, that the debtor received disbursements after

9

Appeal: 09-1209    Doc: 16    Filed: 06/01/2009    Pg: 105 of 107

the invoice dates is insufficient. Instead, the debtor must have received these payments during a time in which the bond claim would have been filed. In this case, the relevant time period in which to look is 90 to 120 days after the invoice date because this is the time period during which Pennington testified that a bond claim would have been filed.

Based on the invoices submitted by Defendant, the court concludes that only two of the invoices meet this test. The first eligible invoice is Invoice Number 312, which was invoiced on March 22, 2004, in the amount of $500.00 for work performed on the University of South Carolina, Beaufort project. According to Defendant's evidence, the debtor received a subsequent disbursement from Brookwood Construction in the amount of $59,625.00 on July 13, 2004. Thus, this disbursement was made 113 days after the invoice date, and assuming that Defendant would have filed a timely bond claim and been paid in full, the bonding company could have asserted a lien on these funds. The second eligible invoice is Invoice Number 317, which was invoiced on March 26, 2004, in the amount of $2,000.00 for work performed on the Cape Fear Community College project. According to Defendant's evidence, the debtor received a subsequent disbursement from Lee F. Cowper, Inc. in the amount of $163,632.40 on June 28, 2004. Thus, this disbursement was made 94 days after the invoice date. Again assuming that Defendant would have filed a timely bond claim and been paid in full, the bonding company could have asserted a lien on these funds as well. In none of the other payments is there evidence that the debtor received money from the general contractor after the bond claim would have been filed.

## CONCLUSION

Based on the foregoing, Defendant has successfully established a new value defense with respect to $2,500.00 of the preferential payments. Therefore, the trustee is entitled to recover

10

$4,805.48 of the preferential payments for the benefit of the estate.  The clerk is directed to enter judgment accordingly.

**"END OF DOCUMENT"**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2009, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

      James Durling Fullerton
      12642 Chapel Road
      Clifton, VA 20124-0000


*/s/ Catherine B. Simpson*
Counsel Press LLC
1011 East Main Street
Suite LL-50
Richmond, Virginia 23219
(804)648-3664